## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ULTIMATE ESCAPES HOLDINGS, LLC, *et al.*,[1] | Case No. 10-12915 (   ) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF PHILIP CALLAGHAN
## IN SUPPORT OF THE DEBTORS' CHAPTER 11
## PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

**PHILIP CALLAGHAN** hereby declares, under penalty of perjury, as follows:

1.      I am the Chief Financial Officer (the "**CFO**") of Ultimate Escapes Holdings, LLC ("**Ultimate Escapes**" and, together with its above-captioned affiliated chapter 11 debtors and debtors-in-possession, the "**Debtors**"). I perform my duties out of the Debtors' headquarters located at 3501 West Vine Street, Suite 225, in Kissimmee, Florida. I submit this declaration (the "**Declaration**") in support of the Debtors' chapter 11 petitions and requests for relief contained in certain "first day" applications and motions filed on or shortly after the date hereof (the "**First Day Motions**").

2.      I have more than thirty (30) years of experience as a finance professional, including twenty (20) years serving as a chief financial officer in various industries. I am admitted as a Fellow of the Institute of Chartered Accountants of England and Wales and hold a Bachelor of Science in Pure Physics from University College London. I have been an officer of Ultimate Escapes since July 2004. Since that time, I have overseen the Debtors' operations and

---

[1]      A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, is attached hereto as **Schedule "1"**.

worked closely with the Debtors' other personnel who handle business operations and financial management, the Debtors' outside counsel and other advisors. I have also participated directly or indirectly in communications and negotiations with the Debtors' secured lenders, vendors and customers, as well as other constituencies.

3.     As the CFO of Ultimate Escapes, I am authorized to submit this Declaration on behalf of the Debtors. Except as indicated otherwise, all statements in this Declaration are based upon my personal knowledge or my review of the Debtors' books and records, other relevant documents and information prepared or collected by the Debtors' employees. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein. In making the statements herein, I have relied in part upon others to accurately record, prepare and collect necessary documentation and information.

4.     Part I of this Declaration provides a brief overview of the Debtors and a summary of these Cases (as defined below). Part II of this Declaration describes in more detail the Debtors' business, the developments which led to the Debtors' chapter 11 filing and their goals in these Cases (as defined below). Part III sets forth the relevant details of the various First Day Motions.

**I.**
**INTRODUCTION**

5.     Since their founding in 2004, the Debtors have grown to be one of the largest operators in the high-end luxury destination club industry. The Debtors provide club members and their families with flexible access to a portfolio of multi-million dollar club residences, exclusive member services and resort amenities. The Debtors also provide their members with preferred access to four and five-star hotel properties and resorts. The Debtors operated prepetition over 119 luxury club residences in various global destinations, including throughout

the United States, Mexico, Central America, the Caribbean and Europe. The majority of the properties are owned by the Debtors (subject to one or more mortgages), and others are leased on either a long or short term basis. The Debtors derive their revenue from the sale of one-time club membership fees, annual dues and additional use fees or other charges related to upgrades.

6. Over the last few years, the destination club industry has gone through dramatic changes and a period of rapid consolidation. The Debtors are too highly leveraged and lack adequate liquidity to sustain operations long term without a restructuring. The Debtors have experienced a decrease in new membership sales and existing member upgrades throughout 2008, 2009 and 2010. The Debtors have attempted over the last year to negotiate a consensual restructuring of their assets and liabilities with their secured lenders or to identify potential sale or merger transactions to permit them to continue as a going concern. Those negotiations did not result in a viable restructuring alternative.

7. As a result, the Debtors, in the exercise of their reasonable business judgment and having reviewed their remaining alternatives, determined that the most effective way to maximize the value of the Debtors' estates for the benefit of their creditor constituencies was to seek bankruptcy protection in order to pursue a sale of substantially all their assets or a restructuring of their assets and liabilities (the "**Sale Process**"). The filing does not include certain non-Debtor affiliates which own properties not subject to a mortgage in favor of CapitalSource (as hereinafter defined).

8. To minimize the adverse effects of the commencement of these chapter 11 cases (the "**Cases**") on their business, the Debtors request various types of relief in the First Day Motions. The First Day Motions are described in greater detail in Part III below. Pursuant to the First Day Motions, the Debtors seek, among other things, to: (a) continue the Debtors' operations

with as little disruption as possible; (b) maintain the confidence and support of the Debtors' employees; (c) obtain authority to use cash collateral; and (d) retain appropriate professionals. Gaining and maintaining the support of the Debtors' key constituencies, as well as operating the Debtors' day-to-day business with minimal disruption and erosion, will be crucial to the success of the Debtors' efforts in these Cases to maximize the value of the Debtors' assets in the Sale Process.

9.     On the date hereof (the "**Petition Date**"), the Debtors commenced their chapter 11 cases by filing voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

## II.
## BACKGROUND

### A.    Overview of the Debtors

10.     Ultimate Escapes is a luxury destination club providing individuals, families and corporate members with flexible access to a portfolio of spectacular multi-million-dollar vacation residences in resort and metropolitan locations throughout the U.S., the Caribbean, Mexico and Europe.   Destination clubs are designed to offer their members an attractive alternative to vacation home ownership and timeshare purchases.   In addition to providing club members with flexible access to a portfolio of 119 luxury club residences in 45 global destinations, club members are offered access to hotel properties and world-class resorts, pre-trip planning advice and on-site concierge services.   With multiple club offerings and various club membership levels, the Debtors have wide market appeal in the destination club industry.

11.     Through a variety of club memberships, including, *Elite Club™*, *Signature Club™* and *Premiere Club™*, the Debtors offer approximately 1,247 club members with

exclusive access to their family of luxury properties. The Elite Club targets properties which are approximately $3 million in value, the Signature Club targets properties which are approximately $2 million in value and the Premiere Club targets properties which are approximately $1 million in value. As of the Petition Date, the Debtors had approximately 463 Elite Club members, 564 Signature Club members and 220 Premiere Club members.

12.     The Debtors are structured to be more affordable and flexible than other luxury consumer vacation and business incentive travel options, especially for anyone requiring access to private homes with multiple bedrooms for friends and family. For individual club members, the Debtors eliminate the uncertainties and expense of renting different homes or villas in multiple United States and international markets. For corporations, the Debtors offer a more affordable, flexible corporate reward and incentive program for top performers, key advisors, key employees and important customers and prospects. By combining the comfort and space of a private vacation residence with the service and amenities of a luxury hotel, the Debtors' club members have the opportunity to travel to exciting destinations, without the financial or maintenance burdens associated with ownership.

13.     The Debtors' target market of club members includes approximately 6.7 million "millionaires" in the United States with assets of at least $1 million and approximately 840,000 "pentamillionaires" in the United States with assets of at least $5 million. Club members gain access to the Debtors' portfolio of properties by joining and paying a one-time, membership fee (similar to a golf club membership) currently ranging from $70,000 to $450,000, depending on the club level and membership usage plan. Club members also pay annual dues currently ranging from $8,000 to $49,000 per year, again based on the corresponding club level and membership usage plan. In addition to annual dues, additional revenues are derived from

upgrades, additional use fees and reciprocity fees from third party operations. Thus far, the Debtors have received approximately $15.5 million in annual dues from members during 2010. The Debtors do not anticipate billing for or receiving any annual dues after September 30, 2010.

14.     The Debtors have focused their business on the creation of a unique brand supported by a valuable portfolio of luxury properties in some of the world's premier resort and urban destinations and target the family vacationer. The Debtors are differentiated from their competitors, in part, by maintaining one of the widest offerings in the destination club industry and offering five tiers of club membership plans. The breadth of the Debtors' club offerings provides members with multiple upgrade paths, both in terms of use rights and club levels.

## B.     Corporate Structure

15.     Ultimate Escapes was founded in 2004, as Ultimate Resort, LLC ("**Ultimate Resort**") by James Tousignant, the current President and Chief Executive Officer of the Debtors, to address the emerging and underserved segment of the luxury shared-use market. From its inception, Ultimate Resort grew rapidly to become one of the largest players in the destination club industry. Believing that achieving "critical mass" (viewed as at least 800 to 1,000 club members) was a key component to operating a successful destination club business model, Ultimate Resort expanded rapidly over the last few years through organic growth and strategic acquisitions.

16.     In May 2007, Ultimate Resort Holdings, LLC ("**Ultimate Resort Holdings**") acquired all of the assets and business of its parent company, Ultimate Resort, and purchased approximately $105 million in real estate assets in federal bankruptcy court as a result of the 2006 bankruptcy of Tanner & Haley. In February 2008, additional real estate assets were purchased for $12 million from Ventures Equity Vacation Club. As a result of these acquisitions, 645 new club membership agreements were signed with previous Tanner & Haley club members

and 19 new club membership agreements were signed with previous club members of Ventures Equity Vacation Club.

17.     In May 2008, Ultimate Resort Holdings signed a cooperative marketing agreement and a definitive contribution agreement to acquire certain assets and assume certain liabilities from Private Escapes Destination Clubs ("**Private Escapes**"), including properties valued at approximately $50 million at the time, located in 28 beach, mountain, golf and metropolitan destinations throughout the world.[2]  On September 15, 2009, Ultimate Resort Holdings contributed all of its assets and liabilities to Ultimate Escapes, and completed the acquisition of certain Private Escapes' assets and liabilities.

18.     On October 29, 2009, a blank check company, Ultimate Escapes, Inc. ("**UEI**")[3] completed a reverse merger business combination with Ultimate Escapes.  Although Ultimate Escapes was legally acquired by UEI, the business combination was accounted for as a reverse merger whereby Ultimate Escapes is the continuing entity for financial reporting purposes and is deemed, for accounting purposes, to have acquired UEI. The Debtors current organizational chart is annexed hereto.

19.     Today, the Debtors serve more than 1,200 club members offering members access to hundreds of luxury beach, mountain golf, metropolitan and leisure club properties in world-class resorts and destinations throughout the world.

C.      **Prepetition Capital Structure**

        (i)      **Secured Loans**

---

[2]     Private Escapes was founded by Richard Keith, who has served as Chairman of Ultimate Escapes since October 2009.

[3]     The blank check company was formed on May 14, 2007 and was originally known as Fortress America Acquisition Corporation II.  On August 6, 2007, Fortress America Acquisition Corporation II changed its name to  Secure America Acquisition Corporation and on October 29, 2009, its name was changed to Ultimate Escapes, Inc.

20.     On or about April 30, 2007, the Debtors entered into a Loan and Security Agreement (the "**Loan Agreement**")[4] with CapitalSource Finance LLC, CapitalSource Bahamas LLC, and the lenders from time to time party thereto (collectively, "**CapitalSource**" or the "**First Lien Lender**"), which provided for both a revolving loan (discussed below) and a term loan (since repaid) (the "**First Lien Debt**"). The Loan Agreement was amended on October 15, 2007 and was further amended on February 14, 2008. The loan was collateralized by substantially all of the Debtors' assets and was guaranteed by Ultimate Resort. The loan is not collateralized by certain properties acquired in the transaction with Private Escapes which are owned by non-Debtor affiliates and which are subject to mortgages in favor of parties other than CapitalSource. The Loan Agreement, as subsequently amended, provided for borrowings up to a defined borrowing base amount based on the appraised value of the Debtors' property. Interest was payable monthly at the three-month LIBOR plus 5%, with a floor of 8.75% per annum. No principal payments were due until maturity on April 30, 2011.

21.     On July 10, 2009, as a result of the Debtors failure to meet certain covenants under the Loan Agreement, the Debtors received a notice of default from CapitalSource. In connection with a proposed reorganization and business combination, the Debtors received a waiver from CapitalSource and on September 15, 2009, the Debtors entered into an Amended and Restated Loan Agreement with CapitalSource (as amended, the "**New Loan Agreement**"). The New Loan Agreement restated the previous April 30, 2007 Loan Agreement and provided the Debtors with borrowings up to the lesser of a defined maximum amount or a defined borrowing base. The New Loan Agreement provided that the Debtors could borrow the lesser of $95,093,000 or 75% of the appraised value of all owned property encumbered by a mortgage in

---

[4]     While the majority of the Debtors are borrowers under the Loan Agreement, some of the Debtors have only signed the Loan Agreement as guarantors.

favor of CapitalSource. The maturity date under the New Loan Agreement is April 30, 2011 with a provision to extend the maturity date for two additional one-year periods, provided the Debtors are not in default on the initial maturity date and on payment of an extension fee. The Debtors are currently in default under the New Loan Agreement and CapitalSource has been funding on a discretionary basis based on a budget provided by the Debtors.

22.     Except for certain payments required on the sale of a mortgaged property, no principal payments are due until maturity on April 30, 2011. However, the Debtors are required to make certain loan amortization payments of $17,800,000 by December 31, 2010, with the remaining balance due on April 30, 2011 if the Debtors do not elect an extension. As of the Petition Date, the principal outstanding under the New Loan Agreement is approximately $92,828,640.83.

**(ii)     Second Lien Loan**

23.     On April 30, 2007, Ultimate Escapes issued a $10,000,000 note payable to JDI Ultimate L.L.C. ("**JDI**"), a non-debtor affiliated company of the Debtors. Interest is payable quarterly at 5% per annum and no principal payments are due until maturity on April 30, 2017. There is accrued interest outstanding on this note. The note, which is subordinate to the loans from CapitalSource, is collateralized by a second security interest in certain real property. JDI subsequently assigned the note to Ultimate Resort Holdings on October 28, 2009.

**(iii)     Mortgage and Other Loans**

24.     In addition the Debtors have ten (10) loans that have recently matured or will mature within the next twelve (12) months. The current portion of these loans is approximately $4,500,000. The loans are collateralized by various properties and bear interest rates ranging

from 6% to 15%. The notes mature at various dates through August 31, 2011. For those notes that have matured, the Debtors are in negotiations to renew.

25.     The Debtors also have nine (9) long term loans with an outstanding balance of $6,700,000. These loans are collateralized by various properties and bear interest rates ranging from 3.375% to 13.5%. These notes mature at various dates ranging from August 2011 through January 2038.

**(iv)     Receivables Financing Loan**

26.     On June 3, 2010, Debtors Ultimate Escapes Holdings, LLC, Ultimate Escapes Signature Club, LLC, Ultimate Escapes Premiere Club, LLC and Ultimate Escapes Elite Club, LLC entered into a Receivables Purchase Agreement with Monterey Financial Services, Inc. Profit Sharing Plan and Trust ("**Monterey**") under which the Debtors sold an undivided interest in $2,000,000 of current and future membership dues for $1,700,000. Repayments commenced on June 15, 2010 and as of June 30, 2010, the remaining amount outstanding is approximately $50,000.

**D.     Events Leading to the Chapter 11 Filing**

27.     The Debtors have experienced a substantial decrease in new membership sales and existing member upgrades throughout 2009 and 2010. In addition, over the last few years there has been a substantial decline in the value of luxury real estate. As a result of these factors the Debtors defaulted on the New Loan Agreement in May 2010. The initial default under the New Loan Agreement was cured but the Debtors defaulted on the New Loan Agreement again in early June as a result of the failure to make the May interest payment. The Debtors and CapitalSource negotiated and agreed to the terms of a forbearance agreement in mid-August (the "**Forbearance Agreement**") which expired on September 10, 2010. Since August 2010, the Company has faced severe liquidity constraints. The Debtors have been actively engaged in

locating other sources of capital to continue to support their business but have been unsuccessful in finding any capital.

28.    CapitalSource is only funding the business on a discretionary basis and the Debtors are unable to generate significant revenues or sell excess properties in their portfolio to provide sufficient funds to sustain current operations.  Together, these events have resulted in a substantial reduction in the Debtors' liquidity position and ultimately, their revenues, which, in turn, have constrained the Debtors' ability to conduct business, and have made them less competitive in the destination club industry.  At this time, there are limited available options for the Debtors to obtain the financing necessary to remain viable.

29.    Although the Debtors undertook certain activities designed to improve their operations, such as selling properties in their portfolio, they have not and will not be able to generate sufficient cash flow to meet their continuing obligations under the New Loan Agreement and operate their business.  Exacerbating the Debtors' liquidity woes and decreased revenue are the unique financial difficulties currently faced by companies in the destination club industry.

30.    As part of the continued efforts by the Debtors to restructure their business, the Debtors retained Sheon Karol of CRG Partners Group, LLC ("**CRG**") as Chief Restructuring Officer ("**CRO**").  The Debtors, CRG and the First Lien Lender are continuing in their efforts to restructure the Debtors' business.  In addition, the Debtors are continuing their efforts to pursue a transaction for the sale of substantially all of the Debtors' assets.

31.    Because of the lack of liquidity, the Debtors sought the protection of chapter 11 to preserve the going concern value of the Debtors and pursue strategic alternatives.  The Debtors believe that chapter 11 protection will allow the Debtors to sell substantially all their assets to

maximize value for the Debtors' estates. In addition to the Debtors' portfolio of properties, the Debtors believe that their member lists and related member data are important and valuable assets. The membership information constitutes highly-sensitive commercial information which, if made publicly available, could potentially dilute the value of the Debtors' estates and impede the Debtors' ability to sell their assets or effectively reorganize. Therefore, to protect the confidentiality of certain member information and preserve the value of the Debtors' assets, the Debtors intend to seek authority to file such membership information under seal. Because of limited liquidity available on a post-petition basis and the need to avoid continuing erosion of member confidentiality the Debtors intend to complete their Sale Process in thirty (30) days.

E.     **The Debtors' Prepetition Marketing Efforts**

32.     On August 16, 2010, the Debtors engaged CRG as restructuring advisor. Shortly thereafter, CRG initiated marketing of the Debtors' assets for sale as a going concern and began soliciting potential buyers (including those potentially interested parties with whom the Debtors had been in discussions). CRG engaged a third party firm, Digital Strategies Group Inc., to research commercial databases and public data sources for strategic and financial entities most likely to purchase the assets. The research was supplemented with CRG's proprietary database of potential financial buyers interested in investing in companies in similar industries and/or situations as the Debtors.

33.     The Debtors and CRG reviewed the data and prepared a list to target a subset of those companies with the financial wherewithal and/or most compelling strategic rationales to pursue a transaction with the Debtors. CRG worked with the Debtors to create various materials that were used for diligence meetings with potential buyers. These materials included descriptive information, financial data and other financial and operating detail that enabled the potential buyers to evaluate the Debtors' operating business.

34. To date, CRG has provided approximately 400 potential buyers with information detailing the operations and finances of the Debtors. CRG has forwarded thirty-five (35) non-disclosure agreements to interested parties. Twenty-three (23) of those potential buyers executed non-disclosure agreements, all of which then engaged in discussions with CRG and/or the Debtors regarding the general parameters of a sale of substantially all of the Debtors' assets. CRG has followed up with all interested buyers, provided due diligence information as requested, answered questions about the Debtors and the sale process and encouraged all parties to move quickly and efficiently to the extent they wished to proceed. In all cases, CRG representatives encouraged qualified buyers to meet with the Debtors' management to obtain a better understanding of the business and going forward opportunity.

35. CRG has conducted discussions and conference calls with a number of buyers. Several potential buyers have expressed an initial indication to acquire substantially all of the Debtors' assets, including four potential buyers who have submitted letters of interest for some or all of the Debtors' assets.

36. In order to maintain the Debtors' enterprise value and post-petition financing pending the sale or restructuring, the Debtors require the use of cash collateral and post-petition financing to fund their business in the ordinary course, including the funding of payroll, and other general expenses and interest expenses. The relief sought in the First Day Motions is necessary in minimizing disruption in the Debtors' business and preventing further erosion of the Debtors' enterprise value in these Cases. A prompt and orderly chapter 11 proceeding will maximize the value of the estates and, therefore, is in the best interests of all stakeholders.

## III.
## FIRST DAY MOTIONS [5]

37.     Concurrently with the filing of the voluntary petitions to commence these Cases, the Debtors will be filing a number of First Day Motions.  The Debtors anticipate that the Bankruptcy Court will conduct a hearing within a business day or two after the commencement of the Cases (the "**First Day Hearing**"), during which the Bankruptcy Court will entertain the argument of counsel with respect to the relief sought in each of the First Day Motions.

38.     Generally, the First Day Motions have been designed to meet the immediate goals of:  (a) establishing procedures for the efficient administration of the Cases; (b) continuing the Debtors' operations during these Cases with as little disruption and loss of productivity as possible;  and  (c)  maintaining  the  confidence  and  support  of  the  Debtors'  other  key constituencies.  I have reviewed each of the First Day Motions, including the exhibits attached thereto, and believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve success in these Cases.

39.     The First Day Motions are summarized below.

**A.      Motion of the Debtors for Entry of an Order
         Directing Joint Administration of Chapter 11 Cases**

40.     Ultimate Escapes is the operating entity of all of the other Debtors in these Cases, such that all of the Debtors constitute "affiliates" of one another within the meaning of 11 U.S.C. § 101(2).[6]  Joint administration of these Cases (a) is warranted because the Debtors' financial

---

[5]  Capitalized terms used in Part III and not otherwise defined herein shall have the meanings ascribed to such terms in the respective First Day Motions.

[6]  Section 101(2) of the Bankruptcy Code defines "affiliate" to include, in relevant part, a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor..." 11 U.S.C. § 101(2).

affairs and business operations are closely related, and (b) will ease the administrative burden on the Bankruptcy Court and parties-in-interest in these Cases. The Debtors anticipate that numerous notices, applications, motions, other documents, pleadings, hearings, and orders in these Cases will affect all of the Debtors. With 85 affiliated Debtors, each with its own case docket, the failure to administer these Cases jointly would result in numerous duplicative pleadings being filed and served upon parties identified in separate service lists. Such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Debtors, the Clerk of this Bankruptcy Court, creditors, and other parties-in-interest in these Cases.

41. Joint administration will permit the Clerk to use a single general docket for the Debtors' Cases and to combine notices to creditors and other parties-in-interest of the Debtors' respective estates. Joint administration also will protect parties-in-interest by ensuring that such parties-in-interest in each of the Debtors' respective Cases will be apprised of the various matters before the Bankruptcy Court in all of these Cases.

**B.** **Motion of the Debtors for Entry of an Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management System, (C) Granting Administrative Expense Status to Post-petition Intercompany Claims, and (D) Waiving Certain Investment and Deposit Guidelines**

42. The Debtors filed a motion to preserve their consolidated cash management system, which builds in efficiencies that should be preserved during the chapter 11 Cases, in order to keep costs and administration to a minimum, which will benefit all creditors (the "**Cash Management Motion**"). Prior to the commencement of their chapter 11 Cases, and in the ordinary course of their business, the Debtors maintained four (4) bank accounts (the "**Bank Accounts**") that the Debtors desire to continue to use. A list of all Bank Accounts used by the Debtors is attached to the Cash Management Motion as Exhibit "A". The Bank Accounts are

15

part of a carefully constructed and highly-automated cash management system (the "**Cash Management System**") that ensures the Debtors' ability to efficiently monitor and control their cash position, as is more fully described in the Cash Management Motion and as set forth in the account flow chart attached to the Cash Management Motion as Exhibit "B".

43.     The Debtors' transition into chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of these Cases with the same account numbers.  The Debtors further request authority to deposit funds in and withdraw funds from all such accounts by all usual means including, but not limited to, checks, wire transfers, automated clearinghouse transfers, electronic funds transfers, and other debits and to treat the Bank Accounts for all purposes as debtor-in-possession accounts.

44.     To minimize administrative expense and delay, the Debtors also request authority to continue to use their pre-printed correspondence, and business forms, including, but not limited to, letterhead, envelopes, promotional materials, and other business forms (collectively, the "**Business Forms**"), substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' "Debtor-in-Possession" status.

45.     The Debtors also make transfers from Ultimate Escapes on behalf of the Debtors' affiliates to pay for certain operating expenses.  Such transfers give rise to intercompany claims (the "**Intercompany Transactions**").   The Debtors maintain records of all Intercompany Transactions, including fund transfers, and thus can ascertain, trace and account for Intercompany Transactions.  The Debtors reconcile all Intercompany Transactions on a monthly basis.   The Debtors will continue to maintain records and appropriately reconcile all Intercompany Transactions post-petition.  The Debtors request authority to grant administrative expense priority to the Intercompany Transactions.

46.     Each relief requested in the Cash Management Motion will help ensure the Debtors' smooth transition into chapter 11 and prevent the possible disruptions and distractions that could otherwise divert the Debtors' attention from more pressing matters during the initial days of these chapter 11 Cases.

**C.     Motion of the Debtors for Entry of an Order (I) Authorizing Debtors to Pay (A) Certain  Prepetition Employee Obligations, and (B) Prepetition Withholding Obligations, and (II) Directing Banks to Honor Related Prepetition Transfers**

47.     One vital First Day Motion is the Debtors' Motion for Entry of an Order (i) Authorizing Debtors to Pay (a) All Prepetition Employee Obligations, and (b) Prepetition Withholding Obligations and (ii) Directing Banks to Honor Related Prepetition Transfers (the "**Employee Wage Motion**").  Employees and Independent Contractors are essential to the continued operation of the Debtors' business and the Employees' morale directly affects their effectiveness and the generation of revenue by the Debtors' assets.  Prepetition, the Debtors streamlined its workforce and the existing Employees and Independent Contractors are necessary to maintain operations during the Sale Process. Consequently, it is critical that the Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date, so that the Employees and Independent Contractors will continue to service the Debtors' operations.  If the checks issued and electronic fund transfers requested in payment of any of the compensation or other Employee obligations are dishonored, or if such obligations are not timely paid post-petition, the Employees may likely suffer extreme personal hardship and may be unable to pay their daily living expenses.  A loss of Employee and Independent Contractor morale and goodwill at this crucial juncture would undermine the Debtors' stability, and undoubtedly would have a negative effect on the Debtors, their members, the value of their assets and business, and their ability to achieve a successful sale.

48.     In order to enable the Debtors to retain their current Employees and Independent Contractors (as described and discussed in the Employee Wage Motion), to minimize the personal hardship such Employees and Independent Contractors may suffer if prepetition employee-related obligations are not paid when due, or honored as expected, and to maintain morale, the Debtors filed a motion to seek authority, in their discretion, to pay and/or honor (a) certain prepetition claims of Employees and Independent Contractors, including but not limited to, claims for wages, salaries, paid time off, and unpaid reimbursable expenses and certain costs and disbursements related to the foregoing, up to the statutory cap of $11,725 per Employee and Independent Contractor, (b) any claims or payments pursuant to the Employee Benefit Plans, and (c) all prepetition federal and state withholding obligations.   In addition, the Debtors are requesting that all banks honor the Debtors' prepetition checks or electronic transfers for payment of the foregoing, and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.

**D.     Motion of the Debtors for Entry of an Order Authorizing Them to Honor Existing Reservations, Accept New Reservations, and Provide Services to Members Under Certain Terms and Conditions**

49.     The Debtors intend to file a motion to request permission to continue to honor existing reservations, and provide services to members under certain terms and conditions, including payment to providers of certain services, as may be required in their discretion (the "**Reservations Motion**").   As part of these Cases, the Debtors plan to conduct a sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code.   Accordingly, to preserve the value of the business as a going concern and maximize such value for potential purchasers, it is critical for the Debtors to be able to continue to honor existing reservations for the next thirty (30) days, within their discretion and with an extension subject to agreement by the post-petition secured lender.

50.     While the Debtors have determined that it may not be economical for them to honor each and every pending reservation or to accept each new reservation, they recognize that if they fail to honor pending reservations, their members will likely cease paying annual dues and/or attempt to resign from the destination clubs, which would harm the value of their business. Thus, while the Debtors ultimately may not honor 100% of existing reservations, they need to have the discretion to do so in these circumstances. As such, the Debtors seek authority to continue to honor existing reservations and pay for certain services and amenities, in their discretion, to ensure that the services and amenities continue to be provided to their members.

**E.     Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures  for Determining Adequate <u>Assurance of Payment</u>**

51.     In connection with the operation of their business and management of their estates, the Debtors obtain electricity, gas, water, sewer services, telephone services, and/or other similar services (collectively, the "**Utility Services**") from a number of utility companies (collectively, the "**Utility Providers**"), including those listed on Exhibit "A" attached to the Utilities Motion (as defined below) (the "**Utility Provider List**").

52.     The Debtors intend to file a motion (the "**Utilities Motion**") to seek entry of a bridge order and a final order giving effect procedures for the provision of adequate assurance of performance to the Utility Providers. Uninterrupted utility services are essential to the preservation of the Debtors' estates and assets, and therefore, to the success of these Cases. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' ability to preserve and maximize the value of their respective estates could be severely and irreparably harmed. Specifically, lack of electricity and phone service would render the Debtors' burglar and fire alarm systems inoperable. In addition, the lack of electricity would cause a shut-

down of the Debtors' operations and it is therefore critical that utility services continue uninterrupted.

**F.**     **Motion Requesting Entry of an Order Pursuant to 11 U.S.C. § 107(b)(1), Fed. R. Bankr. P. 9018, and Local Rule 9018-1(B) Authorizing Debtors to File Certain Confidential, Commercial and Propriety Member Information Under Seal**

53.     The Debtors believe that one of the most important and valuable assets of these estates is the Debtors' list of current members. As set forth in the Debtors' motion requesting entry of an order approving the sale of substantially all of the Debtors' assets outside of the ordinary course of business (the "**Sale Motion**") and the declaration of Sheon Karol in connection with the Sale Motion, the Debtors' members are a valuable asset of the going concern. If the identification of members are revealed, competitors will attempt to interfere with the membership relationship and the Debtors will suffer a reduction in membership. To protect the confidentiality of certain member information, the Debtors intend to file a motion (the "**Motion to Seal**") seeking authorization to file the certain membership information under seal.

54.     In the Motion to Seal, the Debtors request authority to file certain documents under seal or in a redacted form to protect from disclosure information regarding (i) names and all identifying information, and (ii) agreements to which the members are a party with one or more Debtors (collectively, the "**Sealed Information**"). The Debtors propose to file pleadings, schedules, affidavits, notices or other documents which relate to and include information regarding the Sealed Information under seal. This information is and continues to be highly-sensitive commercial information which, if made available, could be used by the Debtors' competitors to their advantage and to the detriment of the Debtors' business.

**G.     Motion of the Debtors for Entry of an Order Authorizing the Debtors to Reject Certain Executory Contracts and Unexpired Leases and Granting Related Relief**

55.     The Debtors determined, in the exercise of their sound business judgment, that certain executory contracts and unexpired leases are no longer necessary to their operations. Therefore, the Debtors filed a motion (the "**Rejection Motion**") requesting authorization to reject certain (i) executory contracts and (ii) unexpired leases (collectively, the "**Rejected Agreements**").  As a result of the Debtors' decision to file for bankruptcy, the Rejected Agreements have become unduly burdensome to the Debtors' estates.  Accordingly, the Debtors are seeking to streamline their operations to the greatest extent possible while still preserving the value of the business as a going concern and maximize such value for potential purchasers.  The Debtors submit that the applicable legal standards for retroactive rejection of leases have been satisfied and have unequivocally evidenced their intent to reject the leases.  A list of the contracts and leases the Debtors intend to reject are listed on Exhibit "A" and Exhibit "B" to the Rejection Motion.

**H.     Chapter 11 Professionals**

56.     In the early days of the Cases, the Debtors anticipate seeking entry of orders authorizing them to employ and retain various professionals to assist them in the conduct of these cases, including:

(a)     Greenberg Traurig, LLP as counsel for the Debtors;

(b)     CRG Partners Group, LLC to provide chief restructuring officer and additional personnel and appointing Sheon Karol as chief restructuring officer to the Debtors;

(c)     BMC Group as claims and noticing agent for the Clerk of this Bankruptcy Court;

(d)     Professionals utilized by the Debtors in the ordinary course of business

57.     The Debtors further anticipate filing an application for an administrative order establishing procedures for the interim and monthly compensation and reimbursement of expenses of professionals.

## IV.
## CONCLUSION

58.     The primary purpose of the filing of these Cases is to prevent deterioration and to protect the going-concern value of the business operated by the Debtors during the Sale Process. In the interim, through the Motions and Applications described above, the Debtors seek to minimize certain adverse effects that these Cases might otherwise have on their business, while honoring the spirit of the chapter 11 process.

59.     To preserve the value of their business to the fullest extent possible, the Debtors' immediate objective is to maintain "business as usual" for the Debtors' operating assets following the commencement of these Cases by minimizing the adverse impact of the filing on the Debtors' assets and operations.   For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Bankruptcy Court grants the relief requested in each of the First Day Motions and respectfully request the Bankruptcy Court to do so.

I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Dated: September 20, 2010

PHILIP CALLAGHAN
SENIOR VICE PRESIDENT
ULTIMATE ESCAPES HOLDINGS, LLC
Debtor and Debtor-in-Possession