

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ULTIMATE ESCAPES HOLDINGS, LLC, et al.,[1] | Case No. 10-12915 (BLS) (Jointly Administered) |
| Debtors. | |

## AMENDED DISCLOSURE STATEMENT WITH RESPECT TO CHAPTER 11 LIQUIDATING
## PLAN PROPOSED BY DEBTORS AND DEBTORS IN POSSESSION

~~June 29,~~ August 23, 2011

~~GREENBERG TRAURIG, LLP~~

~~Scott D. Cousins (Del. Bar No. 3079)~~
~~Sandra G. M. Selzer (Del. Bar No. 4283)~~
~~The Nemours Building~~
~~1007 North Orange Street, Suite 1200~~
~~Wilmington, Delaware 19801~~
~~Telephone: (302) 661-7000~~
~~Facsimile: (302) 661-7360~~
~~cousinss@gtlaw.com~~
~~selzers@gtlaw.com~~

~~-and-~~

~~Nancy A. Mitchell~~
~~200 Park Avenue~~
~~New York, New York 10166~~
~~Telephone: (212) 801-9200~~
~~Facsimile: (212) 801-6400~~
~~mitchelln@gtlaw.com~~

~~*Counsel to Debtors and Debtors in Possession*~~


GREENBERG TRAURIG, LLP

Scott D. Cousins (Del. Bar No. 3079)

---

[1] A list of the Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, is attached to the Plan as **Exhibit 1**.

Sandra G. M. Selzer (Del. Bar No. 4283)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone:  (302) 661-7000
Facsimile:  (302) 661-7360
cousinss@gtlaw.com
selzers@gtlaw.com

-and-

Nancy A. Mitchell
200 Park Avenue
New York, New York 10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400
mitchelln@gtlaw.com

*Counsel to Debtors and Debtors in Possession*

## TABLE OF CONTENTS

**~~PAGE~~**

Page

| | | |
|---|---|---|
| I. | INTRODUCTION | ~~1~~3 |
| | A. CapitalSource Settlement | 2 |
| II. | PLAN VOTING INSTRUCTIONS AND PROCEDURES | ~~1~~3 |
| | A. Definitions | ~~1~~3 |
| | B. Notice to Holders of Claims and Interests | ~~1~~3 |
| | C. Holders of Claims Entitled to Vote | ~~2~~4 |
| | D. Solicitation Package | ~~3~~4 |
| | E. Voting Procedures, Ballots and Voting Deadline | ~~3~~4 |
| | F. Confirmation Hearing and Deadline for Objections to Confirmation | ~~3~~5 |
| III. | HISTORY AND OPERATIONS OF THE DEBTORS | ~~4~~6 |
| | A. The Debtors | ~~4~~6 |
| | B. Description of the Business | ~~5~~7 |
| IV. | PREPETITION CAPITAL STRUCTURE OF THE DEBTORS | ~~5~~7 |
| | A. Secured Loans | ~~5~~7 |
| | B. Second Lien Loan | ~~6~~8 |
| | C. Mortgage and Other Loans | ~~6~~8 |
| | D. Receivables Financing Loan | ~~6~~8 |
| V. | CORPORATE STRUCTURE OF THE DEBTORS | ~~7~~9 |
| VI. | EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES | ~~7~~9 |
| VII. | CHAPTER 11 CASES | ~~8~~10 |
| | A. Continuation of Business; Stay of Litigation | ~~8~~10 |
| | B. First Day Orders | ~~9~~11 |
| | C. Debtor-in-possession Financing and Use of Cash Collateral | ~~9~~11 |
| | D. Appointment of ~~The~~the Committee | ~~9~~11 |
| | ~~E. Other Material Relief Obtained During the Chapter 11 Cases~~ | ~~9~~12 |
| | ~~F~~E. Schedules and Statements of Financial Affairs | ~~9~~12 |
| | ~~G~~F. The Prepetition Marketing Efforts | ~~10~~12 |
| | G. Potential Claims and Causes of Action | 14 |

    H.    ~~Settlement of Certain Intercompany Claims... 11I.~~ The Committee's Investigation of Potential Claims and Causes of Action ......................................................................................~~11~~17

VIII.  SUMMARY OF THE PLAN OF LIQUIDATION ............................................................~~14~~20

    A.    Structure of the Plan .............................................................................................~~14~~20

    B.    Classification and Treatment of Claims and Interests .........................................~~14~~21

    C.    Acceptance or Rejection of the Plan.....................................................................~~18~~28

    D.    Means for Implementation of the Plan..................................................................~~19~~29

    E.    ~~The~~Post-Confirmation Debtors ...........................................................................~~24~~33

    ~~F.~~    ~~Remaining Assets~~ ...............................................................................................~~24~~G.
            .......................................................................... Provisions Governing Distributions ................................................................................................................~~24~~33

    G.    Disputed Claims....................................................................................................36

    H.    Treatment of Executory Contracts and Unexpired Leases....................................~~26~~37

    I.    Confirmation and Consummation of the Plan .......................................................~~26~~37

    J.    Effect of Plan Confirmation..................................................................................~~27~~38

    K.    Retention of Jurisdiction.......................................................................................~~28~~40

    L.    Miscellaneous Provisions .....................................................................................~~30~~42

IX.    CERTAIN U.S. ~~FEDERAL INCOME TAX~~ CONSEQUENCES OF THE PLAN ......................~~32~~44

X.    FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS ...........................~~32~~45

    A.    Feasibility of the Plan ...........................................................................................~~33~~45

    B.    Acceptance of the Plan .........................................................................................~~33~~45

    C.    Best Interests Test.................................................................................................~~33~~45

    D.    Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Plan ................................................................................................................................~~34~~46

    E.    Confirmation Without Acceptance of All Impaired Classes: ~~The "Cramdown" Alternative~~ ..~~34~~
            46

    ~~F.~~    ~~Retention of Jurisdiction~~.......................................................................................~~35~~

XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN..........................................................................................~~35~~47

    A.    Alternative Plan(s) of Liquidation .......................................................................~~35~~47

    B.    Liquidation Under Chapter 7 ................................................................................~~36~~47

XII.    THE SOLICITATION AND VOTING PROCEDURE .....................................................~~36~~48

    A.    General...................................................................................................................~~36~~48

    B.    Parties Entitled to Vote .........................................................................................~~36~~48

    C.    Classes Impaired under the Plan ..........................................................................~~37~~48

    D.    Waivers of Defects, Irregularities, Etc.................................................................~~37~~49

XIII.  RECOMMENDATION AND CONCLUSION ........................................................................ 38̶49

## TABLE OF EXHIBITS

Exhibit A     Chapter 11 Liquidating Plan Proposed by the Debtors and Debtors in Possession

Exhibit B     Liquidating Trust Agreement

Exhibit C     Wind-Down Budget

Exhibit D     List of Executory Contracts and Unexpired Leases to be Assumed

## DISCLOSURE STATEMENT WITH RESPECT TO CHAPTER 11 LIQUIDATING PLAN PROPOSED BY THE DEBTORS AND DEBTORS IN POSSESSION

## I.     INTRODUCTION

Ultimate Escapes Holdings, LLC and its subsidiaries and Affiliates (collectively, the "**Debtors**" or "**Ultimate Escapes**") submit this disclosure statement (the "**Disclosure Statement**")[2] pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the Chapter 11 Liquidating Plan Proposed by the Debtors and Debtors in Possession (the "**Plan**"), dated as of ~~June 29,~~August 22, 2011 and Filed with the Bankruptcy Court. A copy of the Plan is annexed as Exhibit A to this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek protection under chapter 11 of the Bankruptcy Code, significant events that have occurred during these Chapter 11 Cases, the sale of the Debtors' Assets and the anticipated liquidation of the Debtors' Remaining Assets. This Disclosure Statement also describes terms and provisions of the Plan, certain effects of confirmation of the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted. Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, PLEASE SEE ARTICLES VIII AND IX.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASES AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE FULL TEXT OF SUCH DOCUMENTS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE ARTICLE XII OF THE DISCLOSURE STATEMENT, ENTITLED "THE SOLICITATION AND VOTING PROCEDURE."

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

A.     **CapitalSource Settlement**

A cornerstone of the Plan is the implementation of the CapitalSource Settlement, which is a settlement between the Debtors, CapitalSource, and each of their respective Affiliates. The CapitalSource Settlement has been incorporated into the Plan, under which the final $300,000 of financing approved under the Final DIP Order shall be funded on the Effective Date and apply to satisfy Allowed Administrative Claims, including any Deferred Professional Compensation Claim and proceeds from any Avoidance Actions shall apply in the following priorities and amounts:

(i)     (1) First, two million three hundred thousand dollars ($2,300,000) in Avoidance Action Proceeds shall be paid to CapitalSource on account of and in full satisfaction, settlement, release, extinguishment and discharge of its Allowed Class 2 Postpetition Secured Lender Claims against the Debtors and the Debtors' respective Estates.

(ii)    (2) Second, up to the next five hundred thousand dollars ($500,000) of Avoidance Action Proceeds shall be distributed to the Professionals with respect to any Allowed Deferred Professional Compensation Claims that remain unpaid on the Effective Date. The amount of Avoidance Action Proceeds to be distributed to pay such Allowed Deferred Professional Compensation Claims shall be equal to the difference between $500,000 and the amount of Allowed Deferred Professional Compensation Claims not able to be otherwise paid from the Debtors' Estates on the Effective Date. Any portion of such $500,000 that is not applied to the payment of Allowed Deferred Professional Compensation Claims shall be available for Distribution to the Holders of Allowed Class 5 Unsecured Claims in accordance with Section 9.06 of the Plan.

(iii)   (3) Third, the next one million dollars ($1,000,000) of Avoidance Action Proceeds shall be allocated as follows: (i) eighty percent (80%) to CapitalSource on account of its Allowed Lender Unsecured Deficiency Claims; and (ii) twenty percent (20%) to Allowed Class 5 Unsecured Claims.

(iv)    (4) Fourth, the next one million ($1,000,000) dollars of Avoidance Action Proceeds shall be allocated as follows: (i) sixty-five percent (65%) to CapitalSource on account of its Allowed Lender Unsecured Deficiency Claims; and (ii) thirty-five percent (35%) to Allowed Class 5 Unsecured Claims.

(v)     (5) Fifth, the next one million ($1,000,000) dollars of Avoidance Action Proceeds shall be allocated as follows: (i) forty percent (40%) to CapitalSource on account of its Allowed Lender Unsecured Deficiency Claims; and (ii) sixty percent (60%) to Allowed Class 5 Unsecured Claims.

(vi)    (6) Sixth, the balance of such Avoidance Action Proceeds shall be allocated as follows: (i) fifteen percent (15%) to CapitalSource on account of its Allowed Lender Unsecured Deficiency Claims; and (ii) eighty-five percent (85%) to Allowed Class 5 Unsecured Claims. In the event that Avoidance Action Proceeds result in the payment in full of CapitalSource's Allowed Lender Unsecured Deficiency Claims (including all accrued and unpaid interest thereon), any remaining Avoidance Action Proceeds shall be paid to Allowed Class 5 Unsecured Claims.

As discussed more fully below, the Debtors believe that the CapitalSource Settlement is fair and equitable and in the best interests of the Debtors' respective Estates and Creditors. The CapitalSource Settlement permits the Debtors to propose the Plan with the support of CapitalSource and allows the

Debtors to avoid potentially expensive litigation over sharply contested Claims, the outcome of which is uncertain. The Debtors believe that the CapitalSource Settlement incorporated into the Plan falls within the reasonable range of litigation possibilities.

## II.    PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A.    Definitions

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

### B.    Notice to Holders of Claims and Interests

This Disclosure Statement will be transmitted to Holders of Claims that are entitled under the Bankruptcy Code to vote on the Plan. The purpose of this Disclosure Statement is to provide adequate information to enable such Claimholders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan. A discussion and listing of those Holders of Claims that are entitled to vote on the Plan and those Holders of Claims and Interests that are not entitled to vote on the Plan are provided herein.

By order entered on ~~June     , 2011,~~[August 24, 2011], the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable Holders of Claims that are entitled to vote on the Plan to make an informed judgment with respect to acceptance or rejection of the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN. This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Cases.

THIS DISCLOSURE STATEMENT AND THE OTHER MATERIALS INCLUDED IN THE SOLICITATION PACKAGE ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no Person has been authorized to distribute any information concerning the Debtors or the Plan other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES AND ASSUMPTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. The Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement shall not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTING FIRM AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

**C. Holders of Claims Entitled to Vote**

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are in a class that will receive a distribution under a proposed chapter 11 plan are entitled to vote to accept or reject a proposed chapter 11 plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or interests that receive no distribution on account of their claims or interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Article X.B of this Disclosure Statement.

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or interests. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. For a more detailed description of the requirements for confirmation of a non-consensual plan, see Article X.E of this Disclosure Statement entitled, "Confirmation Without Acceptance of All Impaired Classes: The 'Cramdown' Alternative."

**D. Solicitation Package**

Accompanying this Disclosure Statement, among other things, are copies of: (1) the Plan (Exhibit A hereto); (2) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time and place of the hearing to consider the confirmation of the Plan and related matters (the "**Confirmation Hearing**"), and the time for Filing Objections to the confirmation of the Plan (the "**Confirmation Hearing Notice**"); and (3) if you are entitled to vote, one or more Ballots (and return envelopes) to be used by you in voting to accept or to reject the Plan.

**E. Voting Procedures, Ballots and Voting Deadline**

After carefully reviewing the Plan, this Disclosure Statement, and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by checking the appropriate box on the enclosed Ballot. Please complete and sign your original Ballot (copies will not be accepted) and return it in the envelope provided. You must provide all of the information requested by the appropriate Ballot(s). Failure to do so may result in the disqualification of your vote on such Ballot(s).

The Plan does not contemplate or provide for the substantive consolidation of the Debtors' estates following the Effective Date, but all Claims shall be deemed Filed against the consolidated Debtors and shall be deemed one Claim against or obligation of the Debtors as if they were consolidated and such Claimholders shall receive one Distribution from the Debtors' Estates in accordance with the provisions of the Plan. A more detailed description of the non-substantive consolidation of the Debtors' Estates can be found in Section VIII.D below. Each Ballot has been coded to reflect the Class of Claims it represents.

Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED BY THE DEBTORS NO LATER THAN [●, 2011] AT 4:00 P.M. (PREVAILING CENTRAL TIME) (the "**Voting Deadline**") AT:

**By regular US mail:**
BMC Group, Inc.
Attn: Ultimate Escapes Holdings LLC Ballot Processing
PO Box 3020
Chanhassen, MN 55317-3020

**By Messenger or overnight courier:**
BMC Group, Inc.
Attn: Ultimate Escapes Holdings LLC Ballot Processing
18750 Lake Drive East
Chanhassen, MN 55317

BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED. BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE BANKRUPTCY COURT.

**F.     Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), the Confirmation Hearing will be held on [●, 2011 at ● a.m.] (prevailing Eastern Time) before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 1, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing, at any subsequent adjourned Confirmation Hearing or the Notices of Agenda thereof. The Bankruptcy Court has directed that Objections, if any, to confirmation of the Plan be Filed with the Clerk of the Bankruptcy Court and served so that they are ACTUALLY RECEIVED on or before [●, 2011, at ● p.m.] (prevailing Eastern Time) (the "**Confirmation Objection Deadline**") by the following parties:

*Counsel to the Debtors:*

GREENBERG TRAURIG, LLP

Scott D. Cousins (Del. Bar No. 3079)

Sandra G. M. Selzer (Del. Bar No. 4283)

The Nemours Building

1007 North Orange Street, Suite 1200

Wilmington, Delaware 19801
      Telephone: (302) 661-7000
      Facsimile: (302) 661-7360
      cousinss@gtlaw.com
      selzers@gtlaw.com

~~-and-~~

~~Nancy A. Mitchell~~
~~GREENBERG TRAURIG, LLP~~
~~200 Park Avenue~~
~~New York, New York 10166~~
~~Telephone: (212) 801-9200~~
~~Facsimile: (212) 801-6400~~
~~mitchelln@gtlaw.com~~

~~*U.S. Trustee*~~
~~OFFICE OF THE U.S. TRUSTEE~~
~~Attn: David Klauder~~
~~844 King Street, Suite 2207~~
~~Lockbox 35~~
~~Wilmington, DE 19801~~
~~T: 302-573-6491~~
~~F: 302-573-6497~~

~~-and-~~

~~Nancy A. Mitchell~~
~~GREENBERG TRAURIG, LLP~~
~~200 Park Avenue~~
~~New York, New York 10166~~
~~Telephone: (212) 801-9200~~
~~Facsimile: (212) 801-6400~~
~~mitchelln@gtlaw.com~~

~~*Counsel to Committee:*~~
~~POLSINELLI SHUGHART PC~~
~~Christopher A. Ward (Del. Bar No. 3877)~~
~~Shanti M. Katona (Del. Bar No. 5352)~~
~~222 Delaware Avenue, Suite 1101~~
~~Wilmington, Delaware 19801~~
~~Telephone: (302) 252-0920~~
~~Facsimile: (302) 252-0921~~
~~cward@polsinelli.com~~
~~skatona@polsinelli.com~~

~~-and-~~

~~Peter W. Ito~~
~~POLSINELLI SHUGHART PC~~
~~1515 Wynkoop Street, Suite 600~~
~~Denver, Colorado 80202~~
~~Telephone: (303) 572-9300~~
~~Facsimile: (303) 572-7882~~
~~pito@polsinelli.com~~

*U.S. Trustee*
OFFICE OF THE U.S. TRUSTEE
Attn: David Klauder
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801
T: 302-573-6491
F: 302-573-6497

*Counsel to Committee:*
POLSINELLI SHUGHART PC
Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com

-and-

Peter W. Ito
POLSINELLI SHUGHART PC
1515 Wynkoop Street, Suite 600
Denver, Colorado 80202
Telephone: (303) 572-9300
Facsimile: (303) 572-7882
pito@polsinelli.com

### III.     HISTORY AND OPERATIONS OF THE DEBTORS

**A.**     **The Debtors**

The Debtors constitute the debtor entities in these Chapter 11 Cases. A list of the Debtors and their respective case numbers is attached to the Plan as Exhibit 1. By order of the Bankruptcy Court, the Debtors' Chapter 11 Cases were procedurally consolidated for administrative purposes.

**B.**     **Description of the Business**

Ultimate Escapes was a luxury destination club that provided individuals, families and corporate members with flexible access to a portfolio of spectacular multi-million-dollar vacation residences in resort and metropolitan locations throughout the U.S., the Caribbean, Mexico and Europe. Destination clubs are designed to offer their members an attractive alternative to vacation home ownership and timeshare purchases. As of the Petition Date, in addition to flexible access to a portfolio of 119 luxury club residences in 45 global destinations, club members were offered access to hotel properties and world-class resorts, pre-trip planning advice and on-site concierge services. With multiple club offerings and various club membership levels, the Debtors had wide market appeal in the destination club industry.

Through a variety of club memberships, including, Elite Club™, Signature Club™ and Premiere Club™, the Debtors offered approximately 1,247 club members exclusive access to their family of

luxury properties. The Elite Club targeted properties which were approximately $3 million in value, the Signature Club targeted properties which were approximately $2 million in value and the Premiere Club targeted properties which were approximately $1 million in value. As of the Petition Date, the Debtors had approximately 463 Elite Club members, 564 Signature Club members and 220 Premiere Club members.

The Debtors' target market of club members included approximately 6.7 million "millionaires" in the United States with assets of at least $1 million and approximately 840,000 "pentamillionaires" in the United States with assets of at least $5 million. Club members gained access to the Debtors' portfolio of properties by joining and paying a one-time, membership fee (similar to a golf club membership) currently ranging from $70,000 to $450,000, depending on the club level and membership usage plan. Club members also paid annual dues currently ranging from $8,000 to $49,000 per year, again based on the corresponding club level and membership usage plan. In addition to annual dues, additional revenues were derived from upgrades, additional use fees and reciprocity fees from third party operations. The Debtors received approximately $15.5 million in annual dues from members during 2010. The Debtors had not anticipated billing for or receiving any annual dues after September 30, 2010.

## IV.  PREPETITION CAPITAL STRUCTURE OF THE DEBTORS

### A.  Secured Loans

On or about April 30, 2007, the Debtors entered into a Loan and Security Agreement (the "**Loan Agreement**")[3] with CapitalSource Finance LLC, CapitalSource Bahamas LLC, and the lenders from time to time party thereto (collectively, the "**First Lien Lender**"), which provided for both a revolving loan (discussed below) and a term loan (since repaid) (the "**First Lien Debt**"). The Loan Agreement was amended on October 15, 2007, and was further amended on February 14, 2008. The First Lien Debt was collateralized by substantially all of the Debtors' Assets and was guaranteed by Ultimate Resort. The loan was not collateralized by certain properties acquired in the transaction with Private Escapes (as defined below), which were owned by non-Debtor Affiliates and subject to mortgages in favor of parties other than CapitalSource. The Loan Agreement, as subsequently amended, provided for borrowings up to a defined borrowing base amount based on the appraised value of the Debtors' properties. Interest was payable monthly at the three-month LIBOR plus 5%, with a floor of 8.75% per annum. No principal payments were due until maturity on April 30, 2011.

On July 10, 2009, as a result of the Debtors' failure to meet certain covenants under the Loan Agreement, the Debtors received a notice of default from CapitalSource. In connection with a proposed reorganization and business combination, the Debtors received a waiver from CapitalSource and on September 15, 2009, the Debtors entered into an Amended and Restated Loan Agreement with CapitalSource (as amended, the "**New Loan Agreement**"). The New Loan Agreement restated the previous Loan Agreement and provided the Debtors with borrowings up to the lesser of a defined maximum amount or a defined borrowing base. The New Loan Agreement provided that the Debtors could borrow the lesser of $95,093,000 or 75% of the appraised value of all owned properties encumbered by a mortgage in favor of CapitalSource. The maturity date under the New Loan Agreement is April 30, 2011 with a provision to extend the maturity date for two additional one-year periods, provided that the Debtors were not in default on the initial maturity date and pay an extension fee. The Debtors became in default under the New Loan Agreement, and CapitalSource began funding on a discretionary basis based on a budget provided by the Debtors.

---

[3]     While the majority of the Debtors are borrowers under the Loan Agreement, some of the Debtors have only signed the Loan Agreement as guarantors.

Except for certain payments required on the sale of a mortgaged property, no principal payments were due until maturity on April 30, 2011. However, the Debtors were required to make certain loan amortization payments of $17,800,000 by December 31, 2010, with the remaining balance due on April 30, 2011 if the Debtors did not elect an extension. As of the Petition Date, the principal outstanding under the New Loan Agreement was approximately $92,828,640.83.

**B.      Second Lien Loan**

On April 30, 2007, Ultimate Escapes issued a $10,000,000 note payable to JDI Ultimate L.L.C. ("**JDI**"), a non-debtor affiliated company of the Debtors. Interest is payable quarterly at 5% per annum, and no principal payments are due until maturity on April 30, 2017. There is accrued interest outstanding on this note. The note, which is subordinate to the First Lien Debt, is collateralized by a second security interest in certain real property. JDI subsequently assigned the note to Ultimate Resort Holdings (as defined below) on October 28, 2009.

**C.      Mortgage and Other Loans**

In addition, the Debtors have ten (10) loans that have recently matured or will mature within the next twelve (12) months. The current portion of these loans is approximately $4,500,000. The loans are collateralized by various properties and bear interest rates ranging from 6% to 15%. The notes mature at various dates through August 31, 2011. For those notes that have matured, the Debtors are in negotiations to renew. The Debtors also have nine (9) long term loans with an outstanding balance of $6,700,000. These loans are collateralized by various properties and bear interest rates ranging from 3.375% to 13.5%. These notes mature at various dates ranging from August 2011 through January 2038.

**D.      Receivables Financing Loan**

On June 3, 2010, Debtors Ultimate Escapes Holdings, LLC, Ultimate Escapes Signature Club, LLC, Ultimate Escapes Premiere Club, LLC and Ultimate Escapes Elite Club, LLC entered into a Receivables Purchase Agreement with Monterey Financial Services, Inc. Profit Sharing Plan and Trust ("**Monterey**") under which the Debtors sold an undivided interest in $2,000,000 of current and future membership dues for $1,700,000. Repayments commenced on June 15, 2010 and as of June 30, 2010, the remaining amount outstanding is approximately $50,000.

## V.      CORPORATE STRUCTURE OF THE DEBTORS

Ultimate Escapes was founded in 2004, as Ultimate Resort, LLC ("**Ultimate Resort**") by James Tousignant, the former President and Chief Executive Officer of the Debtors, to address the emerging and underserved segment of the luxury shared-use market. From its inception, Ultimate Resort grew rapidly to become one of the largest players in the destination club industry. Believing that achieving "critical mass" (viewed as at least 800 to 1,000 club members) was a key component to operating a successful destination club business model, Ultimate Resort expanded rapidly over the last few years through organic growth and strategic acquisitions.

In May 2007, Ultimate Resort Holdings, LLC ("**Ultimate Resort Holdings**") acquired all of the assets and business of its parent company, Ultimate Resort, and purchased approximately $105 million in real estate assets in federal bankruptcy court as a result of the 2006 bankruptcy of Tanner & Haley. In February 2008, additional real estate assets were purchased for $12 million from Ventures Equity Vacation Club. As a result of these acquisitions, 645 new club membership agreements were signed with previous Tanner & Haley club members and 19 new club membership agreements were signed with previous club members of Ventures Equity Vacation Club.

In May 2008, Ultimate Resort Holdings signed a cooperative marketing agreement and a definitive contribution agreement to acquire certain assets and assume certain liabilities of Private Escapes Destination Clubs ("**Private Escapes**"), including properties valued at approximately $50 million at the time, located in 28 beach, mountain, golf and metropolitan destinations throughout the world.[4] On September 15, 2009, Ultimate Resort Holdings contributed all of its assets and liabilities to Ultimate Escapes, and completed the acquisition of certain Private Escapes' assets and liabilities.

On October 29, 2009, a blank check company, Ultimate Escapes, Inc. ("**UEI**")[5] completed a reverse merger business combination with Ultimate Escapes. Although Ultimate Escapes was legally acquired by UEI, the business combination was accounted for as a reverse merger whereby Ultimate Escapes is the continuing Entity for financial reporting purposes and is deemed, for accounting purposes, to have acquired UEI.

As of the Petition Date, the Debtors served more than 1,200 club members offering members access to hundreds of luxury beach, mountain golf, metropolitan and leisure club properties in world-class resorts and destinations throughout the world.

## VI.    EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES

The Debtors experienced a substantial decrease in new membership sales and existing member upgrades throughout 2009 and 2010. In addition, over the last few years there has been a substantial decline in the value of luxury real estate. As a result of these factors, the Debtors defaulted on the New Loan Agreement in May 2010. The initial default under the New Loan Agreement was cured, but the Debtors defaulted on the New Loan Agreement again in early June of 2010, as a result of the failure to make the May interest payment. The Debtors and CapitalSource negotiated and agreed to the terms of a forbearance agreement in mid-August (the "**Forbearance Agreement**"), which expired on September 10, 2010. Since August 2010, the Debtors faced severe liquidity constraints. The Debtors attempted to locate other sources of capital to continue to support their business but were unsuccessful in finding any capital.

CapitalSource only funded the business on a discretionary basis, and the Debtors were unable to generate significant revenues or sell excess properties in their portfolio to provide sufficient funds to sustain operations. Together, these events resulted in a substantial reduction in the Debtors' liquidity position and ultimately, their revenues, which, in turn, constrained the Debtors' ability to conduct business and made them less competitive in the destination club industry.

Although the Debtors undertook certain activities designed to improve their operations, such as selling properties in their portfolio, they were not able to generate sufficient cash flow to meet their obligations under the New Loan Agreement and operate their business. Exacerbating the Debtors' liquidity woes and decreased revenue were the unique financial difficulties currently faced by companies in the destination club industry.

As part of the continued efforts by the Debtors to restructure their business, on August 16, 2010, the Debtors retained Sheon Karol of CRG Partners Group, LLC ("**CRG**") as Chief Restructuring Officer ("**CRO**"). The Debtors, CRG and the First Lien Lender attempted to restructure the Debtors' business.

---

[4]    Private Escapes was founded by Richard Keith, who, prior to the Petition Date, served as Chairman of Ultimate Escapes since October 2009.

[5]    The blank check company was formed on May 14, 2007 and was originally known as Fortress America Acquisition Corporation II. On August 6, 2007, Fortress America Acquisition Corporation II changed its name to Secure America Acquisition Corporation and on October 29, 2009, its name was changed to Ultimate Escapes, Inc.

In addition, the Debtors continued in their efforts to pursue a transaction for the sale of substantially all of the Debtors' Assets.

Because of the lack of liquidity, the Debtors sought the protection under chapter 11 of the Bankruptcy Code to preserve the going concern value of the Debtors and pursue strategic alternatives. The Debtors believed that chapter 11 protection was the only alternative that would allow the Debtors to sell substantially all of their Assets to maximize value for all of the Debtors' constituents. In addition to the Debtors' portfolio of properties, the Debtors believed that their member lists and related member data were important and valuable Assets.

## VII.    CHAPTER 11 CASES

Below is a general summary of the Debtors' Chapter 11 Cases. A complete copy of the court docket of the Chapter 11 Cases can be found at: www.bmcgroup.com/ultimatescapes.

### A.    Continuation of Business; Stay of Litigation

On the Petition Date, the Debtors Filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code pursuant to sections 1107(a) and 1108 thereof. Under the Bankruptcy Code, the Debtors are authorized to operate their business in the ordinary course of business, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the Filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by Creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors. This relief provided the Debtors with the "breathing room" necessary to assess their business and determine how to maximize the value of their Estates. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan of reorganization or liquidation.

### B.    First Day Orders

At the first day hearing held in these Chapter 11 Cases, the Debtors Filed numerous motions seeking immediate relief. The Bankruptcy Court entered numerous "first day orders." First day orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court. Many of the first day orders obtained in these Chapter 11 Cases are typical for large chapter 11 cases.

### C.    Debtor-in-possession Financing and Use of Cash Collateral

CapitalSource is the postpetition lender to the Debtors under various financing orders entered by the Bankruptcy Court. On October 8, 2010, the Bankruptcy Court entered the *Final Order (I) Authorizing (A) Secured Post-Petition Financing Pursuant 11 U.S.C. §§ 105, 361, 362, and 364(c) and (d); and (B) Granting Security Interests, Superpriority Claims and Adequate Protection, and (C) Use of Cash Collateral* [Docket No. 132] (the "**Final DIP Order**"). On October 25, 2010, the Bankruptcy Court entered the *Supplemental Order (I) Authorizing (A) Secured Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, and 364(c) and (d); and (B) Granting Security Interests, Superpriority Claims and Adequate Protection; and (C) Use of Cash Collateral* [Docket No. 393] (the "**Supplemental DIP**

Order"). On December 1, 2010, the Bankruptcy Court entered the *Second Supplemental Order (I) Authorizing (A) Secured Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, and 364(c) and (d); and (B) Granting Security Interests, Superpriority Claims and Adequate Protection; and (C) Use of Cash Collateral* [Docket No. 473] (the "**Second Supplemental DIP Order**," and together with the Final DIP Order and the Supplemental DIP Order, the "**DIP Orders**").

Pursuant to the DIP Orders, CapitalSource's postpetition financing is secured by a lien on the property of the Debtors. CapitalSource has also asserted that it holds a Secured Claim against any recovery that is obtained from directors/officers, whether or not funded by D&O insurance, and (ii) that the postpetition DIP funds totaling approximately $2.0 million were not subject to the Credit Bid and as such, CapitalSource is entitled to approximately a $2.0 million Administrative Claim against the Estates for that funding. CapitalSource has also taken the position that its Credit Bid of $52,703,363 for substantially all of the Remaining Assets of the Debtors only applied to funds advanced to the Debtors pursuant to the Final DIP Order. As discussed more fully below, the Committee has disputed these claims.

## D. Appointment of the Committee

On September 30, 2010, the Office of the United States Trustee (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (the "**Committee**"). No trustee or examiner has been appointed in any of the Debtors' Chapter 11 Cases.

As initially constituted, the members of the Committee included: Trump International Hotel & Tower ("**Trump**"), Strauss Zelnick, Clive Buckley, World Hotels, Creg McDonald, Marcus W. Acheson, and George Rose. Trump has since resigned from the Committee.

On September 30, 2010, notice was provided that the Committee would be represented by Gordon & Rees LLP and Polsinelli Shughart PC, and would retain FTI Consulting, Inc. as financial advisor. Subsequently, Polsinelli Shughart PC has assumed lead counsel responsibility, and Gordon & Rees LLP has withdrawn as counsel to the Committee.

## E. Other Material Relief Obtained During the Chapter 11 Cases

In addition to the first day relief sought in these Chapter 11 Cases, the Debtors have sought authority with respect to a multitude of matters designed to assist in the administration of the Chapter 11 Cases and to maximize the value of the Debtors' Estates, including the retention of various Professionals. A complete docket of the pleadings Filed in the Chapter 11 Cases can be found at: www.bmcgroup.com/ultimateescapes.

## F. Schedules and Statements of Financial Affairs

On October 16, 2010, each of the Debtors, pursuant to section 521 of the Bankruptcy Code and Rule 1007(b) of the Bankruptcy Rules, Filed their respective Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (collectively, the "**Schedules**") with the Bankruptcy Court. Among other things, the Schedules set forth the Claims of known Creditors against the Debtors as of the Petition Date based upon the Debtors' books and records.

## G. The Prepetition Marketing Efforts

Before the Filing of these Chapter 11 Cases, on August 16, 2010, the Debtors engaged CRG as their restructuring advisor. Shortly thereafter, CRG initiated marketing of the Debtors' Assets for sale as a going concern and began soliciting potential buyers (including those potentially interested parties with whom the Debtors had been in discussions). CRG engaged a third party firm, Digital Strategies Group Inc., to research commercial databases and public data sources for strategic and financial entities most likely to purchase the Assets. The research was supplemented with CRG's proprietary database of potential financial buyers interested in investing in companies in similar industries and/or situations as the Debtors.

Prior to the Petition Date, CRG provided approximately 400 potential buyers with information detailing the operations and finances of the Debtors. CRG forwarded thirty-five (35) nondisclosure agreements to interested parties. Twenty-three (23) of those potential buyers executed non-disclosure agreements, all of which then engaged in discussions with CRG and/or the Debtors regarding the general parameters of a sale of substantially all of the Debtors' Assets. CRG followed up with all interested buyers, provided due diligence information as requested, answered questions about the Debtors and the sale process and encouraged all parties to move quickly and efficiently to the extent they wished to proceed. In all cases, CRG representatives encouraged qualified buyers to meet with the Debtors' management to obtain a better understanding of the business and going forward opportunity.

### 1. The Bid Procedures

On September 21, 2010, the Debtors Filed their *Motion, Pursuant to Sections 105(a), 363(b) and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Rules 2002-1 and 6004-1, Requesting Entry of Order* (the "**Bid Procedures Order**"): *(A) Approving Bid Procedures a Relating to Sale of the Debtors' Assets; (B) Scheduling a Hearing to Consider the Sale; (C) Approving the Form and Manner of Notice of Sale by Auction; (D) Establishing Procedures for Noticing and Determining Cure Amounts; and (E) Granting Related Relief and their Motion, Pursuant to Sections 105(a), 363(b) and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Rules 2002-1 and 6004-1, Requesting Entry of Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Substantially All of the Debtors' Assets Outside the Ordinary Course of Business; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Interests and Encumbrances; and (C) Granting Related Relief* [Docket Nos. 8 and 14, respectively]. On October 8, 2010, the Bankruptcy Court entered the Bid Procedures Order.

### 2. The Auction

On October 18, 2010, pursuant to the Bid Procedures Order, the Debtors commenced an auction for the sale of substantially all of the Debtors' Assets. Upon the conclusion of the auction, the Debtors selected Laurence Development LP ("**Laurence**") as the successful bidder to purchase certain Assets for a purchase price of approximately $14,305,670 in Cash. The Debtors selected The McFadden Family Trust as the successful bidder to purchase one parcel of property for a purchase price of approximately $1,915,988 in Cash. The Debtors selected Dean Factor as the successful bidder to purchase one parcel of property for a purchase price of approximately $1,796,242 in Cash. CapitalSource submitted a Credit Bid of $52,703,363 for substantially all of the Remaining Assets of the Debtors. CapitalSource also remained the Back-Up Bidder (as defined in the Bid Procedures Order) under the terms of its stalking horse bid to the extent that any of the aforementioned sales did not close.

### 3. Bankruptcy Court Approval of Successful Bidders

On October 20, 2010, the Bankruptcy Court conducted a sale hearing and preliminarily approved the above-referenced sales. On October 25, 2010, the Bankruptcy Court entered an order approving the sale (the "**Initial Asset Sales**") of substantially all of the Debtors' respective Assets to (a) CapitalSource; (b) Laurence; and (c) certain individuals [Docket No. 396].

On November 9, 2010, the Debtors Filed a motion seeking Court authorization to take actions to facilitate the proposed sale contemplated by the Laurence (the "**Expedited Travel Motion**") [Docket No. 430]. Specifically, the Debtors sought in the Expedited Travel Motion an order allowing the Debtors to permit existing Ultimate Escapes members (who agreed to become members of clubs operated by Demeure (as defined below) and provided committed funds as a part of their new memberships) to use Ultimate Escapes properties prior to the previously-anticipated closing date of the sale of Assets contemplated by the asset purchase agreement with Laurence as part of the Initial Asset Sales (the "**Laurence APA**").

Subsequent to the Filing of the Expedited Travel Motion, the Debtors, Laurence and CapitalSource entered into negotiations regarding certain modifications to the transactions contemplated by the relevant asset purchase agreements under the Initial Asset Sales (collectively, the "**APAs**"). The foregoing negotiations resulted in, among other things, an agreement by Laurence to waive certain closing conditions set forth in the Laurence APA and proceed with the purchase of substantially all of the Assets contemplated to be purchased thereunder. In return for such agreement, the Debtors and CapitalSource agreed to, among other things, allow Laurence and its affiliated vacation club operator, Demeure Operating Company, Ltd. ("**Demeure**"), to book vacations for members of the Debtors for travel between the date of the order approving the Expedited Travel Motion and December 31, 2010 at certain properties of the Debtors.

On November 23, 2010, the Bankruptcy Court entered an order with respect to the Expedited Travel Motion, which authorized the Debtors to enter into revisions to the APAs which, among other things, authorized members of the Debtors to use properties of the Debtors until the earlier of December 31, 2010 or the date any such property is sold to a third party [Docket No. 462].

## 4. Closing of the Initial Asset Sales

The sales to the individuals in connection with the Initial Asset Sales closed in November 2010. Certain Initial Asset Sales to Laurence closed on November 23, 2010. Several closings in connection with the Initial Asset Sales to CapitalSource occurred on or before December 20, 2010.

## 5. Closing of the Subsequent Asset Sales

The Debtors, through non-debtor subsidiary companies, sold certain real estate holdings upon the approval of the Bankruptcy Court. A property in Belize known as "**Belizean Dreams**" was sold on March 11, 2011, and a property located in the Dominican Republic, known as "**Villa Kary**" was sold on May 6, 2011. Both of these sales resulted in positive net proceeds to the Estates.

## H. Potential Claims and Causes of Action

The Bankruptcy Code preserves the Debtors' rights to prosecute claims and causes of action that exist outside of bankruptcy, and also empowers the Debtors to prosecute certain claims that are established by the Bankruptcy Code, including claims to, inter alia, avoid and recover preferential transfers and fraudulent conveyances (collectively, the "**Causes of Action**"). As described in Article VIII.D below, the Plan preserves all of the Debtors' rights in respect of all Causes of Action, transfers the Debtors' rights in respect of such Causes of Action to the Liquidating Trust, and empowers the

—14—

Liquidating Trustee on behalf of the Plan's beneficiaries to investigate, prosecute, collect, and/or settle the Causes of Action as deemed appropriate.

To date, the Debtors have identified certain Causes of Action that will be transferred to the Liquidating Trust pursuant to the terms of the Plan. The retention and preservation of these Causes of Action, as well as any other Causes of Action that may be discovered, and their prosecution and liquidation by the Liquidating Trust, are an integral part of the Plan.

Except as otherwise provided in the Plan, all Causes of Action, known or unknown, that the respective Debtors and the Debtors' Estates may hold against any Person or Entity shall, on the Effective Date, automatically vest in the Liquidating Trust, free and clear of liens, Claims, encumbrances and Interests. The Liquidating Trustee, on behalf of the Liquidating Trust and subject to the terms of the Liquidating Trust Agreement, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Causes of Action without the consent or approval of any third party and without any further order of the Bankruptcy Court, except as otherwise provided herein or in the Liquidating Trust Agreement. From and after the Effective Date, the Liquidating Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the Liquidating Trust, shall serve as the representative of the Debtors' Estates and shall retain and possess the sole and exclusive right to commence, pursue, settle, compromise or abandon, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal. On the Effective Date, the Liquidating Trustee shall be automatically substituted for the Committee, as plaintiff in any litigation involving the Committee.

The Causes of Action generally fall into the following categories:

**1.    Preference Actions:**

The Debtors have identified in their Schedules certain transfers made within the periods applicable under section 547 of the Bankruptcy Code. All preference actions under section 547 will be retained by the Liquidating Trust and may be pursued by the Liquidating Trust in its sole discretion.

**2.    Potential Directors & Officers Liability Actions:**

With a view towards possible pursuit by the Liquidating Trust, the Committee, in consultation with the Debtors, is currently analyzing potential Causes of Action against former officers and directors, including James M. Tousignant, former CEO of Ultimate Escapes. The Liquidating Trust may initiate litigation against former officers and directors, including Mr. Tousignant for the following Causes of Action, among others:

> ~~i.~~_i._ On or about August 6, 2010, Mr. Tousignant, entered into and executed an agreement (the "**Club Holdings Agreement**") with Club Holdings, LLC ("**Club Holdings**") without the authority and approval of Ultimate Escapes' Board of Directors. The Club Holdings Agreement, arguably, gives Club Holdings the right to contact Ultimate Escapes' members for purposes of soliciting them to join their club, based on certain confidential information which Ultimate Escapes had previously provided to Club Holdings pursuant to a non-disclosure agreement. In addition, CapitalSource has a security interest in certain Ultimate Escapes' membership agreements, and, as a result, Mr. Tousignant's unauthorized execution of the Club Holdings Agreement may have impaired Capital Source's collateral. Notably, as a result of his unauthorized execution of the Club Holdings Agreement, Mr. Tousignant was terminated from his position as CEO of

Ultimate Escapes. Given this information, the Committee has reason to believe that Claims may be made against Ultimate Escapes and certain of its officers or directors. Such Claims may include lawsuits or Claims by or on behalf of club members, Creditors, public shareholders or others alleging a variety of Causes of Action stemming from the execution of the Club Holdings Agreement. In addition, given the circumstances surrounding Mr. Tousignant's separation from the company, it is possible that Ultimate Escapes, including certain officers and directors, may face employment practices-related Claims.

~~ii.~~ ii. On or about August 23, 2010, Ultimate Escapes transferred a $56,169.32 mortgage interest in one of its club properties to Mr. Richard Keith, a former corporate officer, in exchange for payment by Mr. Keith of corporate debt. This conveyance could give rise to a Claim for improper preference or fraudulent transfer, or an action for breach of fiduciary duty.

~~iii.~~ iii. During the twenty-four months prior to the Petition Date, Ultimate Escapes sold numerous club properties for prices below appraised value. Those sales could give rise to Claims for improper preference or fraudulent transfer, or actions for breach of fiduciary duty.

~~iv.~~ iv. For a period leading up to the Petition Date, Ultimate Escapes operated while insolvent or in a "zone of insolvency." Certain Claims may result from transactions occurring during this period. The Committee and the Debtors have received correspondence from various club members complaining that the company accepted payment of annual membership dues while insolvent.

~~v.~~ v. On October 29, 2009, Ultimate Escapes completed a business combination pursuant to a Contribution Agreement, dated September 2, 2009, by and among Ultimate Escapes, Ultimate Escapes Holdings, LLC ("**Ultimate Escapes Holdings**"), Ultimate Resort Holdings and Mr. Tousignant, in his capacity as the representative of the Holders of issued and outstanding ownership units of Ultimate Escapes Holdings and Ultimate Resort Holdings, as amended pursuant to Amendment No. 1 dated as of October 28, 2009 (the "**Contribution Agreement**"). The purpose of the Contribution Agreement was to effect a business combination between the destination club that previously operated as Ultimate Resort and the destination club that previously operated as Private Escapes. The transactions under the Contribution Agreement could give rise to Claims for improper preference or fraudulent transfer, or actions for breach of fiduciary duty.

~~vi.~~ vi. Due to a lack of available funding, certain subsidiaries and Affiliates of Ultimate Escapes did not File for chapter 11 protection. Claims may exist for breach of duty (or similar actions) against Ultimate Escapes or its directors and officers related to the continued operation of the entities outside of an insolvency proceeding.

~~vii.~~ vii. Ultimate Escapes and/or its Board of Directors may face Claims stemming from a Redemption Conversion Program undertaken in or about October 2009 (the "**Redemption Program**"). Specifically, in an effort to garner support for a transaction between Ultimate Escapes and Secure America Acquisition Corporation ("**SAAC**"), Ultimate Escapes offered the Redemption Program,

whereby its members could convert the "redemption amount" owed to them by Ultimate Escapes to shares of SAAC, provided that the members first purchase a like amount of Ultimate Escapes' stock at a pre-determined price. While numerous Club members chose to participate in the Redemption Program, ultimately, SAAC stock was never certified or registered pursuant to the program documents, and the price of Ultimate Escapes' stock dropped dramatically from the purchase price under the program. The circumstances surrounding the Redemption Program may give rise to a variety of Causes of Action.

The Debtors have a directors and officers' insurance policy issued by Chartis with an aggregate policy limitation of $10,000,000 that could potentially be available for these Causes of Action. However, the Debtors and the Committee have not yet concluded an investigation into these potential Causes of Action, nor the potential recoveries on such Causes of Action. This policy, and any proceeds thereof, will be transferred to the Liquidating Trust by the Plan.

The Committee believes that various Causes of Action, including but not limited to claims for breach of fiduciary duty, negligence and misrepresentation, exist against, among others, the Debtors' officers, director and/or employees. On December 23, 2010, the Committee submitted a notice of facts and circumstances letter (the **"Facts and Circumstances Letter"**) to National Union Fire Insurance Company (**"National Union"**) detailing various facts and circumstances that could give rise to claim against, among others, the directors, officers and/or employees of the Debtors under that certain Executive & Organizational Liability Insurance Policy No. 01-317-72-99 (**"Policy"**). The Committee's investigation is still on-going and it is anticipated that upon the creation of the Liquidating Trust that the Liquidating Trustee will continue that investigation. In conducting that investigation, the Committee relied upon the Debtors' representation that the deadline to tender claims under the Policy is December 28, 2014.

### 3. Other Possible Causes of Action

In addition to the Causes of Action listed above, the Debtors hereby reserve the rights of the Liquidating Trust and the Liquidating Trustee, on behalf of the Liquidating Trust, to pursue, administer, settle, litigate, enforce and liquidate:

> ~~i.~~ i. Any other Causes of Action, whether legal, equitable or statutory in nature;

> ~~ii.~~ ii. Any and all actions arising under or actionable pursuant to the Bankruptcy Code, including, without limitation, sections 544, 545, 547, 548, 549, 550, 551, 553(b) and/or 724(a) of the Bankruptcy Code; and

> ~~iii.~~ iii. Any other Causes of Action that currently exist or may subsequently arise and which have not been otherwise set forth above, because the facts upon which such Causes of Action are based are not currently or fully known by the Debtors or the Committee (collectively, the **"Unknown Causes of Action"**). The failure to list or describe any Unknown Cause of Action above is not intended to limit the rights of the Liquidating Trustee, on behalf of the Liquidating Trust, to pursue any such Unknown Cause of Action.

Unless Causes of Action against a Person or Entity are expressly waived, relinquished, released, compromised or settled in the Plan, or any Final Order, the Debtors (before the Effective Date) and the Liquidating Trustee, on behalf of the Liquidating Trust (post-Effective Date), expressly reserve all Causes of Action (including the Unknown Causes of Action) for later adjudication and therefore, no preclusion

doctrine or other rule of law, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a result of the confirmation or Effective Date of the Plan, or the Confirmation Order. In addition, the Debtors and the Liquidating Trustee, on behalf of the Liquidating Trust, and any successors in interest thereto, expressly reserve the right to pursue or adopt any Causes of Action not so waived, relinquished, released, compromised or settled that are alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs and co-defendants in such lawsuits.

## I. The Committee's Investigation of Potential Claims and Causes of Action

### 1. Potential Claims Against CapitalSource

As discussed more fully above, a conflict currently exists between the Committee and CapitalSource regarding (i) CapitalSource's assertion that pursuant to the Prepetition Loan Agreement the obligations of the Debtors to CapitalSource include a first priority security interest in the recovery of Claims against Debtors' directors and officers regardless of whether such recovery is covered by insurance. CapitalSource also asserts that the proceeds of any recovery under Debtors' directors/officers insurance policy (the "**D&O Policy**") first be applied to satisfy the Debtors' obligations under the Prepetition Loan Agreement before anything may be paid to satisfy the Unsecured Claims. Finally, CapitalSource asserts that the monies advanced pursuant to the DIP Orders (totaling approximately $1.6 million) were not subject to the Credit Bid as set forth in the Final DIP Order and, as such, CapitalSource is entitled to the monies advanced pursuant to the Supplemental DIP Order and the Second Supplemental DIP Order as an Administrative Claim.

#### (a)    (a) _The Committee's Claims with Respect to the Debtors' D&O Policy

The Committee asserts that the Prepetition Loan Agreement fails to specifically reflect a lien against any recovery on Claims against officers/directors, including insurance proceeds recovered from the directors' and officers' Claims. The Committee also asserts that proceeds from the applicable D&O Policy could never have been included in the pledge to CapitalSource and that CapitalSource does not have a lien on such proceeds, because proceeds from such D&O Policy were never property that had a right to, title to or interest in. The Committee claims that the D&O Policy is designed to protect the insureds against damages which the insureds must pay out on account of the insureds' own actions.

#### (b)    (b) Postpetition DIP Funds Are Subject to the Credit Bid

The Committee also asserts that CapitalSource was required to credit-bid funds advanced under the Supplemental DIP Order and Second Supplemental DIP Order in connection with the Initial Asset Sales. The Committee also claims that the definition of "remaining DIP Indebtedness" under the Final DIP Order is ambiguous and, accordingly, must be construed against CapitalSource.

#### (c)    The Official Committee of Unsecured Creditors of Ultimate Escapes Holdings, LLC, et al. v. CapitalSource Finance LLC, et al. Adv. Case No. 11-52457 (BLS)

### 2. Settlement with CapitalSource

Since the commencement of the Chapter 11 Cases, the Debtors and their counsel have been negotiating extensively with counsel for the Committee and counsel for CapitalSource to resolve concerns about potential Claims and Causes of Action and the structure of the Plan. Accordingly, pursuant to sections 363, 365, 1123(a)(5) and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, the

Plan incorporates, and is expressly conditioned upon the approval and effectiveness of the CapitalSource Settlement. The CapitalSource Settlement is incorporated into the Plan by reference as if fully set forth therein and, subject to the occurrence of the Effective Date, represents a full, final and complete compromise, settlement, and release of the issues in dispute among the Debtors and CapitalSource, including, among other issues, resolution of all CapitalSource Related Causes of Action.

The Debtors believe that the CapitalSource Settlement is fair and equitable and in the best interests of the Debtors' respective Estates and Creditors. The CapitalSource Settlement assures that Unsecured Creditors will share in the recoveries of Avoidance Actions significantly earlier than would be shared if CapitalSource prevailed on its Claims. The CapitalSource Settlement also permits the Debtors to propose the Plan with the support of CapitalSource and allows the Debtors to avoid potentially expensive litigation over sharply contested Claims, the outcome of which is uncertain. The Debtors believe that the CapitalSource Settlement incorporated into the Plan falls within the reasonable range of litigation possibilities.

Under the Plan and in accordance with the CapitalSource Settlement, the final $300,000 of financing approved under the Final DIP Order shall be funded on the Effective Date and applied to approved Administrative Claims, including Deferred Professional Compensation Claims, and any Avoidance Action Proceeds shall apply in the following priority and amounts:

(1)     First, two million three hundred thousand dollars ($2,300,000) in Avoidance Action Proceeds shall be paid to CapitalSource on account of and in full satisfaction, settlement, release, extinguishment and discharge of its Allowed Class 2 Postpetition Secured Lender Claims against the Debtors and the Debtors' respective Estates.

(2)     Second, up to the next five hundred thousand dollars ($500,000) of Avoidance Action Proceeds shall be distributed to the Professionals with respect to Allowed Deferred Professional Compensation Claims that remain unpaid on the Effective Date. The amount of Avoidance Action Proceeds to be distributed to pay such Allowed Deferred Professional Compensation Claims shall be equal to the difference between five hundred thousand dollars ($500,000) and the amount of Allowed Deferred Professional Compensation Claims not able to be otherwise paid from the Debtors' Estates on the Effective Date. Any portion of such five hundred thousand dollars ($500,000) that is not applied to the payment of Allowed Deferred Professional Compensation Claims shall be available for Distribution to the Holders of Allowed Class 5 Unsecured Claims in accordance with Section 9.06 of the Plan.

(3)     Third, the next one million dollars ($1,000,000) of Avoidance Action Proceeds shall be allocated as follows: (i) eighty percent (80%) to CapitalSource on account of its Allowed Lender Unsecured Deficiency Claims; and (ii) twenty percent (20%) to Allowed Class 5 Unsecured Claims.

(4)     Fourth, the next one million dollars ($1,000,000) of Avoidance Action Proceeds shall be allocated as follows: (i) sixty-five percent (65%) to CapitalSource on account of its Allowed Lender Unsecured Deficiency Claims; and (ii) thirty-five percent (35%) to Allowed Class 5 Unsecured Claims.

(5)     Fifth, the next one million dollars ($1,000,000) of Avoidance Action Proceeds shall be allocated as follows: (i) forty percent (40%) to CapitalSource on account of its Allowed Lender Unsecured Deficiency Claims; and (ii) sixty percent (60%) to Allowed Class 5 Unsecured Claims.

(6)     Sixth, the balance of such Avoidance Action Proceeds shall be allocated as follows: (i) fifteen percent (15%) to CapitalSource on account of its Allowed Lender Unsecured Deficiency Claims; and (ii) eighty-five percent (85%) to Allowed Class 5 Unsecured Claims. In the event that Avoidance Action Proceeds result in the payment in full of CapitalSource's Allowed Lender Unsecured Deficiency Claims (including all accrued and unpaid interest thereon), any remaining Avoidance Action Proceeds shall be paid to Allowed Class 5 Unsecured Claims.

In response to the foregoing settlement, on July 1, 2011, the Committee commenced an action against CapitalSource and its affiliated entities seeking declaratory relief as to the following three issues: (i) whether CapitalSource, pursuant to its Pre-Petition Liens, has a secured claim against any recovery that is obtained from Debtors' officers and directors, whether or not funded by insurance; (ii) whether the agreement by CapitalSource in its capacity as the DIP Lender to credit bid its post-petition financing extended to amount advanced under the Supplemental DIP Orders; and (iii) whether the proceeds of a settlement between the Debtors and the Committee, on the one hand, and Richard V. Keith, on the other, belong to the Debtors' estate as proceeds of an avoidance action or to CapitalSource.

### 3.     Potential Claims Against Richard Keith

On or about August 23, 2010, Private Escapes Platinum Link, LLC and Ultimate Escapes Holdings, LLC executed a note, evidencing an alleged loan from Mr. Keith in the amount of $56,169.32 (the "**Loan**"). The Loan was secured by a Mortgage and Security Agreement recorded on September 10, 2010 as Document ID 2010090200053001001EDEA6 (the "**Mortgage**") in the Office of the City Register of the City of New York against property located at 310 West 52nd Street, Unit 31 B/SU-103, New York, New York 10019 (the "**West 52nd Property**"). On December 21, 2010, the Bankruptcy Court entered an order [Docket No. 522] (the "**West 52nd Sale Order**") authorizing the Debtors to sell the West 52nd Property free and clear of all liens, Claims and encumbrances. The Sale Order further provided that the amount of $56,169.32 ("**Loan Principal**") be held in an interest-bearing escrow (the "**Escrow Account**") pending a judicial determination as to the validity, priority and perfection of the Mortgage. The West 52nd Sale Order further provided that on or before February 14, 2011, a pleading be Filed setting forth a *bona fide* dispute with respect to the Mortgage.

On February 7, 2011, the Committee Filed the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing and Authority to Prosecute Causes of Action on Behalf of the Debtors' Estates* [Docket No. 589] (the "**Standing Motion**"). Pursuant to the Standing Motion, the Committee sought entry of an order authorizing the Committee to prosecute certain Avoidance Actions and Causes of Action pursuant to Chapter 5 of the Bankruptcy Code against Mr. Keith on behalf of the Debtors' Estates related to the Loan and Mortgage. On February 22, 2011, Mr. Keith Filed: (i) *Opposition to Motion by Creditors' Committee for Order Granting Leave, Standing and Authority to Prosecute Causes of Action on Behalf of the Debtor's Estates* [Docket No. 613]; (ii) *Declaration of Richard V. Keith in Opposition to Motion by Creditors' Committee for Order Granting Leave, Standing and Authority to Prosecute Causes of Action on Behalf of the Debtors' Estates* [Docket No. 614]; and (iii) *Request for Release of Second Mortgage Escrow* [Docket No. 615].

CapitalSource has objected to the Debtors' motion to approve the CapitalSource SettlementOn April 15, 2011, the Debtors' filed *Motion of the Debtors for Entry of an Order Pursuant to Sections 363 and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Approval of the Settlement Agreement between the Debtors, the Official Committee of Unsecured Creditors and Richard V. Keith* [Docket No. 679] (the "**Settlement Motion**"). CapitalSource objected to the Settlement Motion on the grounds that the Settlement Motion doesdid not give any insight as to what unusual facts or defenses exist, if any, that would require the settlement of a prima facie preference claim at well below full liability. OnFurther,

CapitalSource argued that on the basis of the Committee's proposed complaint, there ~~is a~~was strong likelihood that if tried on the merits, the Estates would receive a complete recovery—instead of the mere 32.71% of the proceeds held in escrow. ~~Ultimately, this Court must make findings of fact as to whether the proposed CapitalSource Settlement is "fair and equitable" and in the best interests of the Estates. The hearing on the Settlement Motion is currently set for June 22, 2011.~~At the hearing on June 22, 2011, CaptialSource asserted that it and not the Committee was entitled to the funds returned as part of the settlement with Mr. Keith. The Committee disagreed. The Bankruptcy Court neither approved nor denied the Settlement Motion, however, to the extent that a settlement was not reached, it did invite the parties to submit position letters and affidavits outlining further argument.

## VIII.  SUMMARY OF THE PLAN OF LIQUIDATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT AS EXHIBIT A.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF HOLDERS OF CLAIMS OR INTERESTS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST.

### A.     Structure of the Plan

The Plan does not provide for the substantive consolidation of the Debtors following the Effective Date, but all Claims shall be deemed Filed against the Debtors on a consolidated basis, and such Claimholders shall receive one Distribution from the Debtors' Estates in accordance with the provisions of the Plan. The Plan further contemplates the transfer of any Remaining Assets, including Available Cash and any Causes of Action, to a Liquidating Trust. The Liquidating Trustee shall make Distributions to the Creditors from the Liquidating Trust pursuant to the Plan and the Liquidating Trust Agreement.

The Plan constitutes a plan of liquidation for the Debtors collectively. Under the Plan, Claims against, and Interests in, the Debtors are divided into Classes according to their relative seniority and other criteria. A general description of the Classes of Claims against the Debtors created under the Plan, the treatment of those Classes under the Plan, and the property to be distributed under the Plan are described below.

### B.     Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code also requires that a plan of reorganization classify the claims of a debtor's creditors and the interests of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of liquidation may place a claim of a creditor or an interest of an equity holder in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.

The Bankruptcy Code requires that a plan of liquidation provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if relevant Holders of Claims or Interests do not consent to the treatment afforded them under the Plan.

The Debtors believe that in the Plan they have classified all Claims and Interests in compliance with the requirements of section 1122 of the Bankruptcy Code. If a Claimholder or Interestholder challenges such classification of Claims or Interests and the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors, to the extent permitted by the Bankruptcy Court, intend to make such modifications of the classifications of Claims or Interests under the Plan to provide for whatever classification might be required by the Bankruptcy Court for confirmation. UNLESS SUCH MODIFICATION OF CLASSIFICATION ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR INTEREST AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM OR INTEREST REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER IS ULTIMATELY DEEMED TO BE A MEMBER.

Following is a summary of the material terms and provisions of the Plan. A copy of the Plan is attached to this Disclosure Statement as Exhibit A. Unless otherwise defined in this Disclosure Statement, the capitalized terms used herein have the meanings set forth in the Plan.

## 1. Summary of Treatment of Claims and Interests Under the Plan

The table below summarizes the classification and treatment of the Claims and Interests under the Plan. Estimated Claim amounts assume a calculation date of [_____]August_except that Unsecured Claims are calculated as of the Petition Date. Estimated percentage recoveries are also set forth below for certain Classes of Claims. Estimated percentage recoveries have been calculated based upon a number of assumptions, including the estimated amount of Allowed Claims in each Class.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table below. The Debtors have not yet fully reviewed and analyzed all Claims and Interests. Estimated Claim amounts for each Class set forth below are based upon the Debtor's review of its books and records and Filed proofs of Claim, and include estimates of a number of Claims that are Contingent, Disputed, and/or unliquidated.

| Class | Type | Status Under Plan | Treatment | Estimated Aggregate Amount in Class ($) | Estimated Recovery of Class (%) |
|-------|------|-------------------|-----------|------------------------------------------|----------------------------------|
| 1 | Allowed Prepetition Secured Lender Claim | Unimpaired, Deemed to Accept | Class 1 consists of the Allowed Claim of the Prepetition Secured Lender that is secured by the Prepetition Collateral, which Claim shall be Allowed in the amount of the Credit Bid Amount. The Prepetition Secured Lender shall receive, in full satisfaction, settlement, release, extinguishment and discharge of its Allowed Prepetition Secured Lender Claim, the Sale Proceeds up to the Credit Bid Amount and as applied to the Debtors' obligations under the Prepetition Loan Agreement in accordance with Paragraph 4(a) of the Final DIP Order. Because the Prepetition Secured Lender will receive no property under the Plan, the Allowed Prepetition Lender | $92,828,640.83 as of the Petition Date, reduced by the $52,703,363 of Credit Bid to purchase certain of the Debtors' Assets and the bid of Demeure ~~($14,305,670)~~ and two individual purchasers: (Factor $1,796,242 and McFadden $1,915,988) = $36,398,42.16. | 100% of market value of the property as determined by the sale of substantially all of the Debtors' Assets. |

| Class | Type | Status Under Plan | Treatment | Estimated Aggregate Amount in Class ($) | Estimated Recovery of Class (%) |
|---|---|---|---|---|---|
| | | | Claim is Unimpaired, and, therefore, the Prepetition Secured Lender is not entitled to vote on account of its Class 1 Allowed Prepetition Secured Lender Claim. Any Lender Unsecured Deficiency Claim shall be treated as a Class 5 Unsecured Claim. | | |
| 2 | Allowed Postpetition Secured Lender Claim | Unimpaired, Deemed to Accept | Class 2 consists of the Allowed Claim of the DIP Lender secured by the DIP Facility Collateral, which Claim shall be Allowed in the amount of the outstanding balance of the DIP Facility as of the Effective Date, including all accrued and accruing interest, fees, costs and expenses, including without limitation attorneys' fees and costs, then principal and in accordance with Paragraph 4(a) of the Final DIP Order. Pursuant to the CapitalSource Settlement, Class 2 Allowed Postpetition Secured Lender Claim is deemed satisfied in full, and the Holder of the Allowed Class 2 Postpetition Secured Lender Claim will receive no property under the Plan. Therefore, all such Allowed Class 2 Postpetition Secured Lender Claim is Unimpaired, and the DIP Lender is not entitled to vote on account of its Class 2 Claims. | $[~~          ~~]4,696,362.51 * <br><br> *This amount has been disputed by the Official Committee of Unsecured Creditors. | 100% |

| 3 | Allowed Tax and Other Priority Claims | Unimpaired, Deemed to Accept | Class 3 consists of Allowed Tax and Other Priority Claims. Each Holder of an Allowed Class 3 Tax and Other Priority Claim shall receive, in full satisfaction, settlement, release, extinguishment and discharge of its Allowed Tax and Other Priority Claim, at the option of the Debtors or the Liquidating Trustee, either: (A) an amount equal to the unpaid amount of such Allowed Tax and Other Priority Claim in Cash commencing on the later of (i) the Effective Date, (ii) the date that is ten (10) Business Days after such Claim becomes an Allowed Tax and Other Priority Claim by a Final Order and (iii) a date agreed to by the Holder of such Allowed Tax and Other Priority Claim and either the Debtors or the Liquidating Trustee; or (B) such other treatment (x) as may be agreed upon in writing by such Holder of Allowed Tax and Other Priority Claim and the Debtors or the Liquidating Trustee or (y) as the Bankruptcy Court has ordered or may order. | $~~[————]3~~ 1,488.64 | 100% |
| 4 | Allowed Other Secured Claims | Impaired, Entitled to Vote | Class 4 consists of the Allowed Claims of the Holders of Other Secured Claims. Each Holder of an Allowed Class 4 Other Secured Claim shall receive, in full satisfaction, settlement, release, extinguishment and discharge of its Allowed Class 4 Claim, at the option of the Debtors or the Liquidating Trustee, one of the four following forms of treatment: (a) an amount equal to the unpaid amount of such Allowed Other Secured Claim in Cash commencing on the later of (i) the Effective Date, (ii) the date that is ten (10) Business Days after such Claim becomes an Allowed Class 4 Other Secured Claim by a Final Order; or (b) the Debtors shall abandon the property that secures the Allowed Class 4 Claim to the Holder of such Claim on or as soon as practicable after the later of (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date on which such Claim becomes an Allowed Class 4 Claim by a Final Order; or (c) such other treatment as the Holder of the Allowed Class 4 Other Secured Claim and the Debtors or the Liquidating Trustee shall have agreed upon in writing; or (d) (i) such Holder shall retain its lien securing its Allowed Class 4 Other Secured Claim to the extent of the Allowed amount of its Other Secured Claim; and (ii) on or as soon as practicable after the later of (x) the Effective Date and (y) the date that is ten (10) Business Days after such Claim becomes an Allowed Other Secured Claim by a Final Order: (A) the Liquidating Trustee will cure any default other than a default of the kind specified in section 365(b)(2) of the Bankruptcy Code; (B) the maturity of such Allowed Other Secured Claim shall be reinstated as the maturity existed before any default; (C) the Holder of such Allowed Other Secured Claim shall be compensated for any damages which occurred as the result of any | $~~[————]~~ 110,000.00 | ~~[——]~~ ~~——~~ 100% |

| | | | | | |
|---|---|---|---|---|---|
| | | | reasonable reliance by such Claimholder on any provision that entitled such Claimholder to accelerate the maturing of such Claim; and <br><br> (D) the other legal, equitable and contractual rights to which such Allowed Other Secured Claim entitles the Claimholder shall not otherwise be altered. | | |
| 5 | Allowed ~~General~~ Unsecured Claims | Impaired, Entitled to Vote | Class 5 consists of the Allowed Claims of the Holders of Unsecured Claims. Each Holder of an Allowed Unsecured Claim shall receive, in full satisfaction, settlement, release, extinguishment and discharge of its Allowed Class 5 Unsecured Claim, its Pro Rata Share of the Distribution on account of such Allowed Unsecured Claim. | $[———]1 26,429,898.67 | [——] —1 1-4% |
| 6 | Interests | Impaired, Deemed to Reject | Class 6 consists of all Interests, and all stock certificates, instruments, and other documents evidencing such Interests, which shall be cancelled as of the Effective Date. Holders of Interests in Class 6 shall not receive or retain any Distribution or other property on account of such Interests. As a result, Class 6 is conclusively presumed to have rejected the Plan. | N/A | 0% |

## 2. Unclassified Claims.

Administrative Claims consist primarily of the costs and expenses of administration of the Chapter 11 Cases incurred by the Debtors and the Committee. Such costs may include, but are not limited to, the cost of operating the business since the Petition Date, the outstanding unpaid fees and expenses of the Professionals retained by the Debtors and the Committee as approved by the Bankruptcy Court, and the payments that came due in the ordinary course of business after the bankruptcy Filing. All payments to Professionals in connection with the Chapter 11 Cases for compensation and reimbursement of expenses will be made in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Rules and are subject to approval of the Bankruptcy Court as being reasonable.

The Debtors believe that there are sufficient Assets available to pay all Administrative Claims in full on the Effective Date and that the aggregate amount of Administrative Claims will not exceed the Liquidating Trust's ability to pay such Claims when they are allowed and/or otherwise become due.

Subject to the provisions of the Plan, as soon as practicable after the later of (i) the date an Administrative Claim becomes an Allowed Administrative Claim or (ii) the date an Administrative Claim becomes payable pursuant to any agreement between the Debtors or the Liquidating Trust and the Holder of such Administrative Claim, an Allowed Administrative Claimholder will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim or (b) such other treatment as to which the Debtors or Liquidating Trustee and such Claimholder shall have agreed upon in writing; provided, however, that (a) liabilities, accounts payable or other Claims, liabilities or obligations incurred in the ordinary course of business of the Debtors consistent with past practices subsequent to the Petition Date and (b) contractual liabilities arising under loans or advances to the Debtors, whether or not incurred in the ordinary course of business of the Debtors subsequent to the Petition Date, shall be paid or performed by the Debtors in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto; and, provided, however, that, notwithstanding any contract provision or applicable law, or otherwise, that entitles a Holder of an Allowed Administrative Claim to postpetition interest, no Allowed Administrative Claim shall receive postpetition interest on account of such Claim.

Subject to the provisions of the Plan, as soon as practicable after the later of (i) the date a Professional Compensation Claim becomes an Allowed Professional Compensation Claim or (ii) the date a Professional Compensation Claim becomes payable pursuant to any agreement between the Debtors or the Liquidating Trust and the Holder of such Professional Compensation Claim, an Allowed Professional Compensation Claimholder will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Professional Compensation Claim, (a) Cash equal to the unpaid portion of such Allowed Professional Compensation Claim, (b) such other treatment as to which the Debtors or Liquidating Trustee and such Claimholder shall have agreed upon in writing, or (c) as the Bankruptcy Court has ordered or may order. To the extent that there are insufficient funds in the Operating Account following its funding in accordance with Section 9.01 of the Plan, any Allowed Professional Compensation Claim shall become Allowed Deferred Professional Compensation Claims.

Tax and Other Priority Claims are classified in the Plan. Allowed Tax and Other Priority Claims will be paid in full in Cash on the Effective Date or will be paid in full by the Liquidating Trust as they come due in the ordinary course of business.

The Debtors expect to, on or before the Record Date, pursuant to sections 502(b) and 507(a)(7) of the Bankruptcy Code, Bankruptcy Rules 3001, 3003 and 3007, and Local Rule 3007-1, seek to reclassify all Claims which assert priority under section 507(a)(7) of the Bankruptcy Code based on the membership fee, assessments or periodic dues to continue memberships. Each of these Claims is not a priority claim under section 507(a)(7) of the Bankruptcy Code, because the up-front payments to become club members, assessments or periodic dues to continue memberships are not "deposits" within the purview of section 507(a)(7). *See In re Palmas Del Mar Country Club, Inc.*, 443 B.R. 569 (Bankr. D.P.R. 2010).

The Debtors believe that there are sufficient Assets available to pay all Tax and Other Priority Claims in full on the Effective Date and that the aggregate amount of Tax and Other Priority Claims will not exceed the Liquidating Trust's ability to pay such Claims when they are allowed and/or otherwise become due.

### 3. Treatment of Unimpaired Classes of Claims

(a) Class 1 consists of the Allowed Prepetition Secured Lender Claim of CapitalSource. This Claim is secured by substantially all of the Debtors' Assets. The approximate amount of the Claim alleged by CapitalSource as of the Petition Date is $92,828,640.83. Pursuant to the terms of Sale Order, CapitalSource credit bid $52,703,363 of its Prepetition Secured Lender Claim to purchase certain of the Debtors' Assets. CapitalSource will receive payment from its Credit Bid and the sale of other lots of the Debtors' Assets to Demeure and two individual purchasers. These amounts will pay down CapitalSource's Class 1 Claim to the extent of the market value of the property securing such Claim. The Prepetition Secured Lender shall receive, in full satisfaction, settlement, release, extinguishment and discharge of its Allowed Prepetition Secured Lender Claim, the Sale Proceeds up to the Credit Bid Amount and as applied to the Debtors' obligations under the Prepetition Loan Agreement in accordance with Paragraph 4(a) of the Final DIP Order. Because the Prepetition Secured Lender will receive no property under the Plan, the Allowed Prepetition Lender Claim is Unimpaired, and, therefore, the Prepetition Secured Lender is not entitled to vote on account of its Class 1 Allowed Prepetition Secured Lender Claim. Any Lender Unsecured Deficiency Claim shall be treated as a Class 5 Unsecured Claim.

(b) Class 2 consists of the Allowed Postpetition Secured Lender Claim of the DIP Lender secured by the DIP Facility Collateral, which Claim shall be Allowed in the amount of the outstanding balance of the DIP Facility as of the Effective Date, including all accrued and accruing interest, fees, costs and expenses, including without limitation attorneys' fees and costs, then principal

and in accordance with Paragraph 4(a) of the Final DIP Order. Pursuant to the CapitalSource Settlement, Class 2 Allowed Postpetition Secured Lender Claim is deemed satisfied in full, and the Holder of the Allowed Class 2 Postpetition Secured Lender Claim will receive no property under the Plan. Therefore, all such Allowed Class 2 Postpetition Secured Lender Claim is Unimpaired, and the DIP Lender is not entitled to vote on account of its Class 2 Claims.

   (c) Class 3 consists of Allowed Tax and Other Priority Claims. Each Holder of an Allowed Class 3 Tax and Other Priority Claim shall receive, in full satisfaction, settlement, release, extinguishment and discharge of its Allowed Tax and Other Priority Claim, at the option of the Debtors or the Liquidating Trustee, either: (A) an amount equal to the unpaid amount of such Allowed Tax and Other Priority Claim in Cash commencing on the later of (i) the Effective Date, (ii) the date that is ten (10) Business Days after such Claim becomes an Allowed Tax and Other Priority Claim by a Final Order and (iii) a date agreed to by the Holder of such Allowed Tax and Other Priority Claim and either the Debtors or the Liquidating Trustee; or (B) such other treatment (x) as may be agreed upon in writing by such Holder of Allowed Tax and Other Priority Claim and the Debtors or the Liquidating Trustee or (y) as the Bankruptcy Court has ordered or may order.

### 4.   Treatment of Impaired Classes of Claims.

   (a) Class 4 consists of the Allowed Claims of the Holders of Other Secured Claims. Each Holder of an Allowed Class 4 Other Secured Claim shall receive, in full satisfaction, settlement, release, extinguishment and discharge of its Allowed Class 4 Claim, at the option of the Debtors or the Liquidating Trustee, one of the four following forms of treatment:

    (i) an amount equal to the unpaid amount of such Allowed Other Secured Claim in Cash commencing on the later of (x) the Effective Date, (y) the date that is ten (10) Business Days after such Claim becomes an Allowed Class 4 Other Secured Claim by a Final Order; or

    (ii) the Debtors shall abandon the property that secures the Allowed Class 4 Claim to the Holder of such Claim on or as soon as practicable after the later of (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date on which such Claim becomes an Allowed Class 4 Claim by a Final Order; or

    (iii) such other treatment as the Holder of the Allowed Class 4 Other Secured Claim and the Debtors or the Liquidating Trustee shall have agreed upon in writing; or

    (iv) such Holder shall retain its lien securing its Allowed Class 4 Other Secured Claim to the extent of the Allowed amount of its Other Secured Claim; and on or as soon as practicable after the later of (x) the Effective Date and (y) the date that is ten (10) Business Days after such Claim becomes an Allowed Other Secured Claim by a Final Order: (A) the Liquidating Trustee will cure any default other than a default of the kind specified in section 365(b)(2) of the Bankruptcy Code; (B) the maturity of such Allowed Other Secured Claim shall be reinstated as the maturity existed before any default; (C) the Holder of such Allowed Other Secured Claim shall be compensated for any damages which occurred as the result of any reasonable reliance by such Claimholder on any provision that entitled such Claimholder to accelerate the maturing of such Claim; and (D) the other legal, equitable and contractual rights to which such Allowed Other Secured Claim entitles such Claimholder shall not otherwise be altered.

   (b) Class 5 consists of the Allowed Claims of the Holders of Unsecured Claims. Each Holder of an Allowed Unsecured Claim shall receive, in full satisfaction, settlement, release,

extinguishment and discharge of its Allowed Class 5 Unsecured Claim, its Pro Rata Share of the Distribution on account of such Allowed Unsecured Claim. In particular, Class 5 also consists of any Lender Unsecured Deficiency Claim, which is the amount due CapitalSource on its Class 1 Prepetition Secured Lender Claim after application of the proceeds of CapitalSource's Credit Bid and the sale of the Debtors' property to other interested purchasers. The Lender Unsecured Deficiency Claim shall be treated *pari passu* with other Class 5 Unsecured Claims and in accordance with the terms of the CapitalSource Settlement.

     **5.**    **Treatment of Impaired Classes of Interests.** Class 6 consists of all Interests, and all stock certificates, instruments, and other documents evidencing such Interests, which shall be cancelled as of the Effective Date. Holders of Interests in Class 6 shall not receive or retain any Distribution or other property on account of such Interests. As a result, Class 6 is conclusively presumed to have rejected the Plan.

**C.**    **Acceptance or Rejection of the Plan**

     **1.**    **Impaired Classes of Claims Entitled to Vote.** Each Impaired Class of Claims that will (or may) receive or retain property or any Interest in property under the Plan shall be entitled to vote to accept or reject the Plan; provided, however, that the votes of Holders of Intercompany Claims shall not be solicited, and any Ballots submitted by such Holders shall not be counted.

     **2.**    **Classes Deemed to Accept the Plan.** Classes 1, 2 and 3 are Unimpaired under the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, such Class is conclusively presumed to have accepted the Plan, and the votes of Holders of Claims in such Classes therefore shall not be solicited.

     **3.**    **Acceptance by Impaired Classes.** Classes 4 and 5 are Impaired under the Plan, and, thus, the votes of Holders of Claims in such Classes shall be solicited. Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Plan is accepted by the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

     **4.**    **Class Deemed to Reject the Plan.** Holders of Interests in Class 6 are not entitled to receive any Distribution under the Plan on account of their Interests. Pursuant to section 1126(g) of the Bankruptcy Code, each Holder of a Class 6 Interest is conclusively presumed to have rejected the Plan in respect of such Interests. Accordingly, Interestholders in such Class are not entitled to vote to accept or reject the Plan and the votes of such Holders are not being solicited in connection with the Plan.

     **5.**    **Elimination of Classes.** Any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether such Class has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

     **6.**    **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.** To the extent that any Impaired Class that is entitled votes to reject the Plan or is deemed to have rejected the Plan, the Debtors may request confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

     **7.**    **Confirmability and Severability of a Plan.** The confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to each Debtor or consolidated group of Debtors. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan as

it applies to any particular Debtor or consolidated group of Debtors. A determination by the Bankruptcy Court that the Plan, as it applies to a particular Debtor, is not confirmable pursuant to section 1129 of the Bankruptcy Code shall not limit or affect: (i) the confirmability of the Plan as it applies to any other Debtor; or (ii) the Debtors' ability to modify the Plan, subject to the limitations in Section 15.01 of the Plan, as it applies to any particular Debtor, to satisfy the confirmation requirements of section 1129 of the Bankruptcy Code.

## D.    Means for Implementation of the Plan

### 1.    Administrative Consolidation of the Debtors.

For purposes of the Plan and for the administrative convenience of the parties, Holders of Claims against or Interests in each Debtor shall receive identical treatments within a particular Class as referenced in the Plan, and the treatment for each Class shall be deemed to automatically apply to Holders of Claims or Interests within such Class of each Debtor, as if there were separate but identical plans of liquidation Filed in each of the Chapter 11 Cases. The Plan does not provide for the substantive consolidation of the Debtors following the Effective Date, but all Claims shall be deemed Filed against the consolidated Debtors and shall be deemed one Claim against or obligation of the Debtors as if they were consolidated, and such Claimholders shall receive one Distribution from the Debtors' Estates in accordance with the provisions of the Plan.

Unless the Bankruptcy Court has approved by a prior order the administrative consolidation of the Debtors' Estates, the Confirmation Order will serve as the order approving the administrative consolidation of the Debtors' Estates.

### 2.    The Liquidating Trust

The Plan provides for the creation of the Liquidating Trust for the purpose of, among other things, administering and liquidating the Assets of the Debtors, including without limitation all Causes of Action and Avoidance Actions, and making Distributions.

(a)    Appointment of Liquidating Trustee. The Debtors shall designate <u>Walker Nell Partners, Inc. as</u> the Liquidating Trustee for the Liquidating Trust <u>or any other Liquidating Trustee as requested by the Committee.</u> The Debtors shall File a Notice of Appointment of Liquidating Trustee at least one (1) week prior to the hearing on ~~the Disclosure Statement~~<u>confirmation of the Plan.</u> The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Liquidating Trust Agreement and shall be entitled to reasonable compensation as set forth therein without further application to or order of the Bankruptcy Court.

(b)    Assignment of the Remaining Assets to the Liquidating Trust. Except as otherwise provided in the Plan, pursuant to section 1141(b) and (c) and section 1123(b)(3) of the Bankruptcy Code, on the Effective Date the property of the Estates, including all Remaining Assets, shall be transferred and automatically revest in the Liquidating Trust, free and clear of all liens, charges or other encumbrances, Claims and Interests, and all such liens, charges or other encumbrances, Claims and Interest, shall be extinguished except as otherwise provided in the Liquidating Trust Agreement and the Plan. The transfer and revesting of all Causes of Action and Avoidance Actions shall include any attorney-client privilege, work-product privilege or other privilege or immunity attaching to any documents or communications (whether written or oral). The Liquidating Trustee may pursue any Remaining Assets, as appropriate, in accordance with what is in the best interests, and for the benefit of, the Creditors who are beneficiaries of the Liquidating Trust. The Liquidating Trustee shall retain all rights on behalf of the Debtors to commence and pursue any and all Causes of Action and Avoidance

Actions (under any theory of law or equity, including, without limitation, the Bankruptcy Code, and in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases) to the extent that the Liquidating Trustee deems appropriate. The Liquidating Trustee shall have the absolute discretion to pursue or not pursue any and all Avoidance Actions as it determines is in the best interests, and for the benefit of, the Creditors who are beneficiaries of the Liquidating Trust and shall not have liability for the outcome of its decision in this regard.

(c)     Purposes of the Liquidating Trust.  The Liquidating Trust will be organized for the purposes set forth in the Liquidating Trust Agreement, the terms of which are approved by the entry of the Confirmation Order.  For federal tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations and that such trust is owned by its beneficiaries.  Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution of an undivided interest in each of the Remaining Assets and then contributed such interest to the Liquidating Trust.  The Liquidating Trustee shall be the exclusive trustee of the Debtors' respective Estates under title 11 for purposes of section 3713(b) of title 31 of the United States Code and section 6012(b)(3) of title 26 of the United States Code.

(d)     Responsibilities of the Liquidating Trustee.  The responsibilities of the Liquidating Trustee under the Liquidating Trust Agreement and the Plan shall include: (i) the receipt of the Remaining Assets of the Debtors' Estates on behalf of and for the benefit of the Claimholders under the Plan; (ii) establishing and maintaining the Operating Account and the Distribution Reserves; (iii) investing the Cash held in the Distribution Reserves in accordance with Section 9.02 of the Plan; (iv) pursuing Objections to, estimations of and settlements of Claims and Interests (other than a Claim or an Interest that is Allowed or deemed to be Allowed pursuant to the Plan or a Final Order); (v) prosecuting retained Causes of Action including Avoidance Actions and Claims with respect to any Approved Asset Sales; (vi) calculating and implementing all Distributions to be made under the Plan to Creditors holding Allowed Claims; (vii) marketing, selling, leasing or otherwise disposing of or realizing the value of all the Remaining Assets; (viii) managing the wind down of the Debtors' Estates; (ix) filing all required tax returns and paying taxes and all other obligations on behalf of the Liquidating Trust from funds in the Distribution Reserves; and (x) such other responsibilities as may be vested in the Liquidating Trustee pursuant to the Plan, the Liquidating Trust Agreement or Bankruptcy Court order or as may be necessary and proper to carry out the provisions of the Plan.

(e)     Powers of the Liquidating Trustee.  The Liquidating Trustee shall have, without Bankruptcy Court approval in each of the following cases, the authority and power to: (i) invest funds in, and withdraw, make Distributions and pay taxes and other obligations owed by the Debtors or incurred by the Liquidating Trustee in connection with the wind down of the Estate, from the Distribution Reserves, including from the Operating Account, in accordance with the Plan; (ii) engage employees and professional Persons to assist the Liquidating Trustee with respect to its responsibilities; (iii) retain the services of experienced auctioneers, brokers, and/or marketing agents to assist and/or advise in the sale or other disposition of the Remaining Assets; (iv) pay the fees and expenses of the professional Persons, agents and employees engaged by the Liquidating Trustee and to pay all other expenses for winding down the affairs of the Debtors and the Liquidating Trust in each case in accordance with the Wind-down Budget, or as determined by the Bankruptcy Court; (v) dispose of, and deliver title to others of, or otherwise realize the value of all the Remaining Assets; (vi) compromise and settle Claims and Causes of Actions and Avoidance Actions; (vii) act on behalf of the Debtors in all adversary proceedings and contested matters (including, without limitation, Avoidance Actions) pending in the Bankruptcy Court and in all actions and proceedings pending elsewhere, and to settle, retain, enforce, dispute or adjust any Claim or Interest and otherwise pursue actions involving Assets of the Debtors that could arise or be asserted at any time under the Bankruptcy Code, unless otherwise waived or relinquished in the Plan; (viii) File a motion requesting that the Bankruptcy Court convert the Chapter 11 Cases to cases under

chapter 7 of the Bankruptcy Code, subject to the rights of all parties in interest to oppose such motion; and (ix) exercise such other powers as may be vested in or assumed by the Liquidating Trustee pursuant to the Plan, the Liquidating Trust Agreement or Bankruptcy Court order or as may be necessary and proper to carry out the provisions of the Plan. The Liquidating Trustee shall exercise such powers in accordance with the provisions of the Plan and the Liquidating Trust Agreement.

(f)     Retention of Professional and Other Persons. The Liquidating Trustee shall be authorized to retain and pay professional Persons and such other Person the Liquidating Trustee determines in his sole discretion to be necessary to carry out his duties and responsibilities, or otherwise to accomplish the purposes of the Plan, the Confirmation Order and the Liquidating Trust Agreement. The Liquidating Trustee shall have the right to pay such retained Persons from the Remaining Assets without further order of the Bankruptcy Court. Any professional Persons retained by the Liquidating Trustee shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred. The payment of the fees and expenses of the Liquidating Trustee's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; provided, however, that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

(g)     Resignation, Death or Removal of Liquidating Trustee. The Liquidating Trustee may resign at any time upon thirty (30) days written notice, Filed with the Bankruptcy Court. Such resignation may become effective prior to the expiration of such thirty (30) days notice period upon appointment of a permanent or interim successor Liquidating Trustee pursuant to the terms of the Liquidating Trust Agreement. The Liquidating Trustee may be removed pursuant to the terms of the Liquidating Trust Agreement.

(h)     Liquidating Trustee Standard of Care; Exculpation. Neither the Liquidating Trustee, nor any director, officer, Affiliate, employee, employer, professional, agent or representative of the Liquidating Trust shall be personally liable, in connection with affairs of the Liquidating Trust, to any Claimholder or beneficiary of the Liquidating Trust, or any other Person, except for such acts or omissions which shall constitute willful misconduct or gross negligence. Persons dealing with the Liquidating Trustee, or seeking to assert claims against the Liquidating Trust, shall look only to the Remaining Assets to satisfy any liability incurred by the Liquidating Trust, the Liquidating Trustee or other Persons employed or retained by the Liquidating Trust to carry out the terms of the Plan, the Confirmation Order, and the Liquidating Trust Agreement. The Liquidating Trustee is entitled to rely upon and shall have no liability in relying upon the advice of professional Persons retained by the Liquidating Trust.

(i)     Compensation of Liquidating Trustee. The Liquidating Trustee shall be compensated pursuant to the terms of the Liquidating Trust Agreement. The payment of the fees and expenses of the Liquidating Trustee shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; provided, however, that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

In addition to reimbursement for the actual out-of-pocket expenses incurred, the Liquidating Trustee, and any employees or professionals engaged or retained by the Liquidating Trustee, shall be entitled to reasonable compensation for services rendered in connection with the preparation and implementation of the Plan. Subject to the terms and provisions of the Wind-down Budget, with respect to the Liquidating Trustee, the terms of his or her compensation shall be as set forth in the Liquidating Trust Agreement. Subject to the terms and provisions of the Wind-down Budget, with respect to any employees engaged and professionals retained, such compensation shall be in an amount and on such terms as may be agreed to by the Liquidating Trustee and such employees or professionals, including in

accordance with any employment agreements with such employees and professionals. Any dispute with respect to such compensation shall be resolved by agreement among the parties or, if the parties are unable to agree, as determined by the Bankruptcy Court.

        (j)     Exculpation and Indemnification. Except as otherwise set forth in the Plan or the Liquidating Trust Agreement, the Liquidating Trustee and any Person retained or employed by the Liquidating Trust shall be defended, held harmless and indemnified from time to time by the Liquidating Trust against any and all losses, claims, costs, expenses and liabilities to which such indemnified parties may be subjected by reason of such indemnified party's performance of duties pursuant to the discretion, power and authority conferred on such Person by the Liquidating Trust Agreement, the Plan or the Confirmation Order; provided, however, that the indemnification obligations arising pursuant to Section 8.10 of the Plan shall not indemnify either the Liquidating Trustee or any Person retained or employed by the Liquidating Trust, for any actions taken by such Persons which constitute willful misconduct or gross negligence.

        (k)     Transfer of Books and Records. On the Effective Date, the Liquidating Trustee shall obtain from the Debtors all company books and records.

        (l)     Investment of Funds. Cash held in the Distribution Reserves shall be invested by the Liquidating Trustee in United States Treasury Bills, commercial paper having an investment grade rate of A-1 or its equivalent, as permitted by section 345 of the Bankruptcy Code or by order of the Bankruptcy Court.

        (m)     Tax Reporting. The Liquidating Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and in accordance with Section 8.13 of the Plan. The Liquidating Trustee shall also annually send to each record Holder of a beneficial interest of an Allowed Claim (and to Holders of Disputed Claims when such Disputed Claims become Allowed) a separate statement setting forth the Holder's share of items of income, gain, loss, deduction, or credit and will instruct all such Holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial Holders with instructions to report such items on their federal income tax returns. The Liquidating Trust's taxable income, gain, loss, deduction, or credit will be allocated to the Holders of Allowed Claims (and to Holders of Disputed Claims when such Disputed Claims become Allowed) in accordance with their relative beneficial interests in the Liquidating Trust. Notwithstanding anything to the contrary herein, for all purposes relevant to tax reporting, allocations of items of taxable income, gain, loss, deduction or credit with respect to the Liquidating Trust and Distributions on Claims, Disputed Claims, Professional Compensation Claims and US Trustee Fees shall be calculated as of the close of each taxable year of the Liquidating Trust. If any Disputed Claims become Allowed during the taxable year, the Holder thereof shall be allocated items of income, gain, loss, deduction or credit as if such Disputed Claim had been Allowed on the first day of such taxable year.

        (n)     Valuation of Liquidating Trust Assets. As soon as practicable after the Effective Date, the Liquidating Trustee shall provide the Claimholders with a valuation of the Assets transferred to the Liquidating Trust and such valuation shall be used consistently for all federal income tax purposes. All items of income, deduction, credit or loss of the Liquidating Trust shall be allocated for federal, state and local income tax purposes among the Claimholders as set forth in the Liquidating Trust Agreement; provided, however, that to the extent that any item of income cannot be allocated in the taxable year in which it arises, the Liquidating Trust shall pay the federal, state and local taxes attributable to such income (net of related deductions) and the amount of such taxes shall be treated as having been received by, and paid on behalf of, the Claimholders receiving such allocations when such allocations are ultimately made. The Liquidating Trust shall not be deemed a successor of the Debtors.

(o)     Dissolution.  The duties, responsibilities and powers of the Liquidating Trustee shall terminate after the Cash and other Remaining Assets have been distributed to the Creditors on the Final Distribution Date in accordance with the Plan.

(p)     Claims Administration and Prosecution; and Plan Distributions.   After the Effective Date, the Liquidating Trustee shall have the power and authority to (a) prosecute and resolve Objections to Claims against the Debtors' Estates, including, but not limited to, those Claims which the Debtors have previously identified or objected to as Disputed Claims; (b) make payments on Disputed Claims that subsequently become Allowed; and (c) make Distributions to Holders of Allowed Claims in accordance with the terms of the Plan, the Liquidating Trust Agreement and any subsequent order of the Bankruptcy Court.

(q)     Prosecution of Avoidance Actions.  After the Effective Date, the Liquidating Trustee shall have the power and authority to prosecute and resolve all Claims, Avoidance Actions and Causes of Action of the Debtors' Estates and shall be a representative of each of the Debtors' Estates, without the need to File a motion to intervene, as provided in section 1123(b)(3) of the Bankruptcy Code.

(r)     Setoff.  Subject to the terms and conditions of the Liquidating Trust Agreement, the Debtors and/or the Liquidating Trustee may, but shall be not required to, set off against any Claim and the payments or other Distributions to be made under the Plan on account of the Claim, claims of any nature whatsoever that the Debtors may have against the Holder thereof, provided, that any such right of setoff that is exercised shall be allocated, first, to the principal amount of the related Claim, and thereafter to any interest portion thereof, but neither the failure to do so nor the allowance of any Claim thereunder shall constitute a waiver or release by the Debtors and/or the Liquidating Trustee of any such claim that the Debtors may have against such Holder.

**E.     Post-Confirmation Debtors**

On the Effective Date, the Debtors shall be dissolved without any further action by the stockholders, directors or members of the Debtors, and the officers, members and employees of the Debtors as of the day preceding the Effective Date shall be deemed to be employees of the Liquidating Trust on the Effective Date.  Before the Effective Date the Debtors' officers or members, or on or after the Effective Date the Liquidating Trustee, shall file certificates of dissolution of the Debtors, and shall take all other actions necessary or appropriate to effect such mergers and dissolution under Delaware state law.

**F.     Provisions Governing Distributions**

**1.     ~~1.~~ Funding of Operating Account Under The Plan.**

On the Effective Date, the Liquidating Trustee shall fund the Operating Account with the Operating Account Funding Sources.  Distributions on account of Allowed Administrative Claims, Allowed Tax and Other Priority Claims and Allowed Other Secured Claims shall be made in accordance with Section 2.02, Section 4.03 and Section 4.04 of the Plan.

**2.     ~~2.~~ Funding of Distribution Reserves Under the Plan.**

After Distributions on account of Allowed Administrative Claims, Allowed Tax and Other Priority Claims and Allowed Class 4 Claims shall be made in accordance with Section 2.02, Section 4.03 and Section 4.04 of the Plan, on the Effective Date, the Liquidating Trustee shall fund the Distribution Reserves by the following sources of funds in the following order of priority:

(a)    *Disputed Administrative Claims and Disputed Tax and Other Priority Claims*~~(b)~~ ──────────────────: The Cash deposited in the Distribution Reserve with respect to Disputed Administrative Claims shall be equal to the amount of the Disputed Administrative Claims and funded by the Operating Account Funding Sources. The Cash deposited in the Distribution Reserve with respect to Disputed Tax and Other Priority Claims shall be equal to the amount of Disputed Tax and Other Priority Claims and funded by the Operating Account Funding Sources.

(b)    ~~(b)~~ ──── *Disputed Class 4 Other Secured Claims*: The Cash deposited in the Distribution Reserve with respect to Disputed Other Secured Claims shall be equal to the amount of the Disputed Other Secured Claims and shall be funded for each Disputed Other Secured Claim by the proceeds from the collateral that is the subject of the Other Secured Claim but only up to an amount equal to the Disputed Other Secured Claim.

(c)    *Disputed Class 5 Unsecured Claims*: The Cash deposited in the Distribution Reserve with respect to Disputed Class 5 Unsecured Claims shall be funded by the remaining funds in the Distribution Reserve after the funding of Distribution Reserves for Disputed Administrative Claims, Disputed Tax and Other Priority Claims and Disputed Other Secured Claims.

Such funding shall be free and clear of all Claims and liens and contractually imposed restrictions, except for any lien provided for in the Plan and the liens which have attached to the net proceeds to be transferred to the Liquidating Trustee. The Liquidating Trustee may seek one or more orders of the Bankruptcy Court, upon notice to parties affected thereby, estimating or modifying the amount of Cash or Available Cash to be deposited in any Distribution Reserve. Any additional Cash or Available Cash shall be allocated as provided for herein, except as otherwise provided by order of the Bankruptcy Court upon motion on appropriate notice determining that it is necessary to utilize Cash or Available Cash in any Distribution Reserve to pay amounts due to more senior Classes or to pay out-of-pocket expenses that are then unpaid.

**3.**    ~~3.────~~**Distributions to Holders of Allowed Administrative Claims and Allowed Tax and Other Priority Claims.**

Commencing on the Effective Date, the Liquidating Trustee shall, in accordance with Section 2.02 and Section 4.03 of the Plan, respectively, distribute to each Holder of a then unpaid Allowed Administrative Claim and Allowed Tax and Other Priority Claim the Cash Distribution to which the Allowed amount of such Holder's Claim entitles such Holder. The Cash deposited in the Distribution Reserve in respect of Disputed Administrative Claims and Disputed Tax and Other Priority Claims (or portions thereof) shall be maintained by the Liquidating Trustee for Distribution to the Holders of Administrative Claims and Tax and Other Priority Claims pursuant to Section 2.02 and Section 4.03 of the Plan, respectively, if and to the extent that the balance, if any, of such Claims is Allowed by a Final Order. The sum of (A) the amount, if any, by which the Distribution Reserve exceeds the amount of Disputed Administrative Claims and the amount of Disputed Tax and Other Priority Claims plus (B) the amount, if any and without limitation or duplication, of the Administrative and Tax and Other Priority Distribution Reserve Surplus (resulting from all or a portion of Disputed Administrative Claims and Disputed Tax and Other Priority Claims becoming Disallowed Claims) shall be maintained in the Distribution Reserve for the Holders of Allowed Class 5 Unsecured Claims and shall become Available Cash for Distribution to the Holders of Allowed Class 5 Unsecured Claims in accordance with Section 4.05 of the Plan.

**4.**    4.────**Distributions to Holders of Allowed Class 4 Other Secured Claims.**

Unless (A) the Holder of an Allowed Class 4 Other Secured Claim and the Debtors or the Liquidating Trustee agree otherwise or (B) the Bankruptcy Court has ordered otherwise, Distributions to each Holder of an Allowed Class 4 Other Secured Claim shall be made in accordance with Section 4.04 of the Plan. The Cash deposited in the Distribution Reserve in respect of Disputed Class 4 Other Secured Claims shall be maintained by the Liquidating Trustee as part of the Distribution Reserve and shall be distributed to the Holders of Class 4 Other Secured Claims pursuant to Section 4.04 of the Plan, if and to the extent that the balance, if any, of such Claims is Allowed by a Final Order. The sum of (A) the amount, if any, by which the Distribution Reserve exceeds the Allowed amount of the Disputed Class 4 Other Secured Claims plus (B) the amount, if any and without limitation or duplication, of the Class 4 Distribution Reserve Surplus (resulting from all or a portion of Disputed Class 4 Other Secured Claims becoming Disallowed Claims) shall be maintained in the Distribution Reserve for the Holders of Allowed Class 5 Unsecured Claims and shall become Available Cash for Distribution to the Holders of Allowed Class 5 Unsecured Claims in accordance with Section 4.05 of the Plan. To the extent that an Allowed Class 4 Other Secured Claim is Allowed after the Effective Date, the Holder thereof shall be entitled to receive the Cash reserved with respect to the Allowed amount of such Claim and earned interest thereon, calculated from the Effective Date through and including the day immediately preceding the applicable Distribution Date. The earned interest on such Distribution shall be paid at the same time as the Distribution made to the Holder of a Secured Claim.

**5.** ~~5.~~ **Distributions to Holders of Allowed Class 5 Claims.**

(a) ~~(a)~~ Distributions on the Allowed amounts of Class 5 Claims shall be made to the Holders thereof in accordance with Section 4.05 of the Plan and after the funding of the Distribution Reserves in accordance with Section 9.02 of the Plan. Cash remaining after a Distribution, if any, is made to the Holders of Allowed Class 5 Unsecured Claims on the Initial Distribution Date shall be transferred to the Distribution Reserve for the Claimholders in Class 5 and shall be distributed on each succeeding Distribution Date to the Holders of Allowed Unsecured Claims in such Class 5, with and each Holder of an Allowed Unsecured Claim in such Class 5 receiving its Pro Rata Share of the Distribution to such Class 5; provided, however, that with respect to such Distributions, in the event the aggregate value available for Distribution to all Holders of Allowed Class 5 Unsecured Claims aggregates less than $20,000, such amounts shall instead be distributed to such Holders on the next succeeding Distribution Date on which there is $20,000 or more in aggregate value available for Distribution.

(b) ~~(b)~~ To the extent that a Class 5 Unsecured Claim is Allowed after the Effective Date, or if such Claim was an Allowed Claim on the Effective Date but no Distribution was made to the Holders of Allowed Unsecured Claims in Class 5 on the Effective Date, the Holder thereof shall be entitled to receive the Cash reserved with respect to the Allowed amount of such Claim.

(c) ~~(c)~~ To the extent that after the Effective Date a Class 5 Unsecured Claim is Disallowed or is Allowed in an amount less than the Disputed portion of such Claim, the Class 5 Distribution Reserve Surplus resulting from the disallowance of all or a portion of such Claim shall become Available Cash for subsequent Distribution to the Holders of Class 5 Allowed Claims in accordance with Section 9.06 of the Plan.

**6.** ~~6.~~ **No Duplicate Distributions.** In accordance with the Plan and unless otherwise expressly provided therein, to the extent that more than one Debtor is liable for any Claim, such Claim shall be considered a single Claim against the consolidated Debtors and entitled only to the payment provided therefor under the applicable provisions of the Plan and the Liquidating Trust Agreement.

**7.** ~~7.~~ **No Interest on Claims.** Unless otherwise specifically provided for in the Plan or the Confirmation Order, postpetition interest shall not accrue or be paid on Claims, and no Claimholder

shall be entitled to interest accruing on or after the Petition Date on any Claim, right, or Interest. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

**8.** 8.——**Delivery of Distributions**. Distributions to Allowed Claimholders shall be made by the Disbursing Agent (a) at the addresses set forth in the certified claims register provided by the Claims Agent to the Disbursing Agent; (b) at the addresses set forth on the proofs of Claim or Interest Filed by such Claimholders (or at the last known addresses of such Claimholders if no proof of Claim or Interest is Filed or if the Liquidating Trustee has been notified in writing of a change of address), (c) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related proof of Claim or Interest, or (d) at the addresses reflected in the Schedules if no proof of Claim or Interest has been Filed and the Liquidating Trustee has not received a written notice of a change of address. If any Claimholder's Distribution is returned as undeliverable, no further Distributions to such Claimholder shall be made. Amounts in respect of undeliverable Distributions shall be returned to the Liquidating Trust. If the beneficiary to such payment does not serve a written Claim for the undeliverable Distribution within ninety (90) days after such Distribution was originally made, such undeliverable Distribution shall revert to the Liquidating Trust. Upon such reversion, the Claim of any Claimholder, or their successors, with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

**9.** 9.——**De Minimis Distributions**. No payment of Cash in the amount of less than $50.00 shall be required to be made on account of any Allowed Claim. Such undistributed amount shall revert to the Liquidating Trust for use in accordance with the Liquidating Trust Agreement.

**10.** 10.——**Fractional Dollars**. The Liquidating Trustee shall not be required to make Distributions of fractions of dollars. Whenever a payment of a fraction of one dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest whole dollar (up or down), with one-half (1/2) dollars being rounded down.

**11.** 11.——**Record Date**. At the close of business on the Record Date, the claims register and the claims transfer register shall be closed with respect to all Claims and there will be no further changes in the record Holder of such Claim. The Disbursing Agent will have no obligation to recognize any transfer or sale of a Claim occurring after the Record Date and will be entitled for all purposes to recognize and distribute only to those Claimholders who are Holders of such Claims, or participants therein, as set forth on the claims register maintained by the Claims Agent. The Disbursing Agent will instead be authorized and entitled to recognize and deal for all purposed under the Plan only with those record Holders stated on the Claims register or identified on the claims transfer register as of the close of business on the Record Date. Notwithstanding anything in the Plan to the contrary, the Disbursing Agent may, in its reasonable discretion, recognize the transfer of or the sale of any participation in, any Allowed Class 5 Unsecured Claim that occurs after the Effective Date.

## G. Disputed Claims

**1.** 1.——**No payment or Distribution Pending Allowance.**

**(a)** (a)—No payment shall be made under the Plan with respect to a Disputed Claim until the Objection to allowance or motion for determination of the value of security has been resolved by agreement of the parties to such Objection or motion or by Final Order.

<u>(b)</u>    ~~(b)~~—The Liquidating Trustee shall have the right and responsibility for administering, disputing, objecting to, compromising or otherwise resolving Disputed Claims and making Distributions on Disputed Claims once such Claims become Allowed Claims.

<u>(c)</u>    ~~(c)~~—No later than 180 days after the Effective Date (unless further extended by order of the Bankruptcy Court) the Liquidating Trustee shall File Objections to Claims with the Bankruptcy Court and serve such Objections on the Holders of each such Claim. Nothing contained herein shall limit the right of the Liquidating Trustee to object to Claims if any, Filed or amended after the deadline for Objection to Claims. The Liquidating Trustee shall be authorized to, and shall resolve all Disputed Claims by withdrawing or settling any Objection thereto, or by litigating to judgment in the Bankruptcy Court or such other court, as shall have jurisdiction over the Claim.

**H.    Treatment of Executory Contracts and Unexpired Leases**

**1.    Rejected Contracts and Leases**.  Except as otherwise provided in the Plan, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all prepetition Executory Contracts and Unexpired Leases to which any Debtor is a party, on and subject to the occurrence of the Effective Date, unless such contract or lease (a) previously shall have been assumed or rejected by the Debtors, (b) previously shall have expired or terminated pursuant to its own terms before the Effective Date, or (c) is identified as a contract or lease to be assumed; provided, however, that the Debtors may amend such list of contracts or leases to be assumed at any time prior to the Confirmation Date.

**2.    Assumption of Director and Officer Liability Insurance Policies**.  Notwithstanding anything in the Plan to the contrary<u> or in Exhibit D hereto</u>, as of the Effective Date, the Debtors shall assume all of the director and officer liability insurance policies pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the director and officer liability insurance policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the director and officer liability insurance policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.  On or before the Effective Date, the Debtors may obtain reasonably sufficient tail coverage (i.e., director and officer insurance coverage that extends beyond the end of the policy period) under a directors and officers' liability insurance policy for the current and former directors, officers, and managers for such terms or periods of time, and placed with such insurers as are determined by the Debtors to be reasonable under the circumstances or as otherwise specified and ordered by the Bankruptcy Court in the Confirmation Order.  The Plan and the Confirmation Order shall not diminish or impair (A) the enforceability of any insurance policies of the Debtors (including, but not limited to the directors and officers' liability insurance policy) that may cover Claims against the Debtors or any other Person or Entity or (B) the continuation of workers' compensation programs in effect, including self-insurance programs.

**3.    Bar to Rejection Damages**.  If the rejection of an Executory Contract or Unexpired Lease pursuant to Section 11.01 of the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the applicable Debtor or its Estate, the Liquidating Trustee or their respective successors or properties unless a proof of Claim is Filed and served on the Liquidating Trustee and counsel for the Liquidating Trustee within thirty (30) days after service of a notice of entry of the Confirmation Order or such other date as prescribed by the Bankruptcy Court.

## I.     Confirmation and Consummation of the Plan

**1.     Conditions to Confirmation**.  The Plan shall not be confirmed unless and until the following conditions have occurred or have been duly waived by the Debtors (if waivable) pursuant to Section 12.03 of the Plan: (a) the form and substance of the Confirmation Order shall be satisfactory to the Plan Proponents; (b) the Bankruptcy Court shall have approved the identity and appointment of the Liquidating Trustee and the form of the Liquidating Trust Agreement and shall have determined that the Liquidating Trustee is duly authorized to take the action contemplated to be taken pursuant to the Plan and the Liquidating Trust Agreement effective on or after the Confirmation Date; (c) the Liquidating Trustee shall have executed the Liquidating Trust Agreement evidencing the Liquidating Trustee's agreement to serve in that capacity; and (d) the Bankruptcy Court shall have entered a Final Order in form and substance satisfactory to the Debtors and the Liquidating Trustee decreeing that on the Effective Date the transfers to Liquidating Trust contemplated by the Plan (i) are or will be legal, valid and effective transfers of property, (ii) do not or will not constitute fraudulent conveyances under any applicable law, (iii) are fair and reasonable and constitute reasonably equivalent value under the Bankruptcy Code and applicable state law, and (iv) do not and will not, except as contemplated by the Liquidating Trust Agreement, subject the Liquidating Trust, the Liquidating Trustee, or the property so transferred to any liability by reason of such transfer under applicable law or any theory of law including, without limitation, any theory of successor or transferee liability.

**2.**     2.——**Conditions to Effective Date**.  The Effective Date shall occur only if the Confirmation Order and other orders specified in Section 12.01 of the Plan shall either have become Final Orders or such orders shall not have been vacated, reversed, stayed, enjoined or restrained by order of a court of competent jurisdiction.  The Debtors intend to request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Rule 3020(e) of the Federal Rules of Bankruptcy Procedure, the Confirmation Order shall take effect immediately upon its entry.

**3.**     3.——**Waiver of Conditions Precedent**.  The Debtors may waive any of the conditions set forth in Section 12.01 or Section 12.02 of the Plan at any time, without any notice to other parties-in-interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

**4.**     4.——**Consequences of Non-Occurrence of Effective Date**.  If the Effective Date does not occur within sixty (60) days after the Confirmation Date, or by such later date, after notice and hearing, as is proposed by the Debtors, then upon motion by the Debtors and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court approves an order granting such motion.  If the Confirmation Order is vacated pursuant to Section 12.04 of the Plan, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims provided for thereby shall be null and void without further order of the Bankruptcy Court; (c) the time within which the Debtors may assume and assign, or reject all Executory Contracts and Unexpired Leases shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated; and (d) nothing contained in the Plan or Disclosure Statement shall constitute a waiver or release of any Claims, Interests, Causes of Action or Avoidance Actions.

## J.     Effect of Plan Confirmation

**1.     Binding Effect**.  The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Claimholders and Interests, and their respective successors and assigns.

2. **Exculpation and Limitation of Liability.** ~~.~~ Except as otherwise specifically provided in the Plan, to the maximum extent permitted by the Bankruptcy Code and applicable law, none of (a) the Debtors, (b) the Committee, (c) the Liquidating Trustee, (ed) CapitalSource, nor (de) any of their respective members, officers, directors, shareholders, employees, advisors, attorneys or agents acting in such capacity on the Confirmation Date including Jeffrey Sparks and Sheon Karol (collectively, the "**Released Parties**") on or after the Petition Date, shall have or incur any liability to, or be subject to any right of action by, any Claimholder or an Interest, or (with respect to such Claims or Interests) any of their respective agents, Affiliates, or any of their successors or assigns, ~~for any act or omission~~ for any act or omission relating to, in any way, or arising from (i) these Chapter 11 Cases, (ii) formulating, negotiating, or implementing the Plan (including the Disclosure Statement), any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan; (iii) any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring or liquidation of the Debtors; (iv) the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan, or (v) the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence (the "**Precluded Claims**"), and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Released Parties from liability.

3. **Releases by the Debtors.** ~~.~~ Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors, on their own behalf and as a representative of their respective Estate, shall, and shall be deemed to, completely and forever release, waive, void, extinguish, and discharge unconditionally, each and all of the Settling Parties and Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies, and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are or may be based in whole or part on any act, omission, transaction, event, or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, their respective Assets, property, and Estates or the Chapter 11 Cases, that may be asserted by or on behalf of any of the Debtors or their respective Estates, against any of the Settling Parties and Released Parties; provided, however, that nothing in Section 13.03 of the Plan shall be construed to release any Settling Parties and Released Parties from willful misconduct or gross negligence as determined by a Final Order. Holders of Allowed Administrative Claims, Allowed Tax and Other Priority Claims, Allowed Professional Compensation Claims and Allowed Non-Tax Priority Claims will be deemed to be bound to the releases in Section 13.03 of the Plan.

4. **Injunction Related to Exculpation and Releases.** ~~.~~ Except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that from and after the Confirmation Date (i) all Persons that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, Causes of Action or liability of any nature whatsoever, relating to any of the Debtors or any of their respective Assets, property and Estates, that is released or enjoined pursuant to Article XIII of the Plan and (ii) all other parties in interest in these Chapter 11 Cases are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against the Estate(s), the Liquidating Trustee, ~~the~~ CapitalSource (or any of its members from time to time), the Settling Parties, any ~~Releases~~ Released Party or any of their property on account of any such Claims, Interests or Precluded Claims, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities:

(a) ~~(a)~~ commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; or

(b) ~~(b)~~ enforcing, attaching (including, without limitation, any prejudgment attachment), executing, collecting, or recovering in any manner, directly or indirectly, any judgment, award, decree, or other order; or

(c) ~~(c)~~ creating, perfecting or enforcing, directly or indirectly, in any manner, any lien or encumbrance of any kind;;

(d) ~~(d)~~ setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under the Plan; and

(e) ~~(e)~~ commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

Any Entity injured by any willful violation of such injunction shall recover actual damages, including, but not limited to, costs and attorneys' fees and expenses, and, in appropriate circumstances, may recover punitive damages from the willful violator.

5.      **Terms of Bankruptcy Injunction or Stays.**  All injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until all property of the Estates of the Debtors has been distributed, the Debtors have been dissolved, the Liquidating Trust Agreement has terminated and the Bankruptcy Court has entered an order closing the Chapter 11 Cases; provided, however, that any injunction that by its terms is permanent or otherwise is intended to survive the Effective Date and Distributions thereunder (whether by law or pursuant to order of the Bankruptcy Court) shall be continued without modification, notwithstanding anything to the contrary in the Plan.

## K.      Retention of Jurisdiction

1.      **Exclusive Jurisdiction of Bankruptcy Court.**  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain after the Effective Date exclusive jurisdiction of all matters arising out of, arising in or related to, the Chapter 11 Cases to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

(a) ~~(a)~~ allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether Filed before or after the Effective Date and whether or not Contingent, Disputed or unliquidated), including the compromise, settlement and resolution of any request for payment of any Administrative Claim or Priority Claim, the resolution of any Objections to the allowance or priority of Claims or Interests and the resolution of any dispute as to the treatment necessary to reinstate a Claim pursuant to the Plan and to hear and determine any other issue presented thereby or arising thereunder, including during the pendency of any appeal relating to any Objection to such Claim or Interest (to the extent permitted under applicable law);

(b) ~~(b)~~ grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(c) (e)——hear and determine motions, applications, adversary proceedings, contested matters and other litigated matters pending on, Filed or commenced after the Effective Date that may be commenced by the Debtors thereafter, including proceedings with respect to the rights of the Debtors to recover property under sections 542, 543 or 553 of the Bankruptcy Code, or to bring any Avoidance Action, or to otherwise collect to recover on account of any Claim or Cause of Action that the Debtors may have;

(d) determine and resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e) determine and resolve any matters related to any Approved Asset Sales;

(f) to ensure that all payments due under the Plan and performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

(g) construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and Consummation of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan and protection of the Liquidating Trust and the Liquidating Trustee in accordance with sections 524 and 1141 of the Bankruptcy Code following Consummation;

(h) determine and resolve any case, controversies, suits or disputes that may arise in connection with the Consummation, interpretation, implementation or enforcement of the Plan (and all Exhibits to the Plan) or the Confirmation Order, including the indemnification and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any Entity's rights arising under or obligations incurred in connection therewith;

(i) modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code and Section 15.01 thereof or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

(j) issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation, implementation or enforcement of the Plan or the Confirmation Order;

(k) enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(l)      determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

(m)      determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)      hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

(o)      continue to enforce the automatic stay through the Effective Date;

(p)      hear and determine (A) disputes arising in connection with the interpretation, implementation or enforcement of the Plan or (B) issues presented or arising under the Plan, including disputes among Holders and arising under agreements, documents or instruments executed in connection with the Plan;

(q)      hear and determine all disputes or controversies with respect to any Approved Asset Sales, or in connection with the interpretation, implementation or enforcement of rights under any agreement with respect to any Approved Asset Sales;

(r)      enter a Final Decree closing any and all of the Chapter 11 Cases or converting any or all of them into chapter 7 cases;

(s)      determine and resolve controversies related to the Disbursing Agent;

(t)      enter any orders necessary to effectuate the transactions in Articles VI and VII thereof or the Liquidating Trust Agreement; and

__(u)__      ~~(u)~~——hear and determine any other matter relating to the Plan.

**__2.__**      ~~2.~~——**Non-Exclusive Jurisdiction of Bankruptcy Court**.  Following the Effective Date, the Bankruptcy Court will retain non-exclusive jurisdiction of the Chapter 11 Cases to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

__(a)__      ~~(a)~~——recover all Assets of the Debtors and property of their respective Estates, wherever located;

__(b)__      ~~(b)~~——hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar or related matters with respect to the Debtors or the Debtors' respective Estates arising prior to the Effective Date or relating to the period of administration of the Chapter 11 Cases, including, without limitation, matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; and

__(c)__      ~~(c)~~——hear any other matter not inconsistent with the Bankruptcy Code.

**__3.__**      ~~3.~~——**Failure of Bankruptcy Court to Exercise Jurisdiction**.  If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Debtors, including with respect to the matters set forth in Sections 14.01 and 14.02 of

the Plan, Article XIV of the Plan shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

## L.    Miscellaneous Provisions

**1.    Plan Modification.** The Plan may be amended or modified in the manner provided for under sections 1127(a) or (b) of the Bankruptcy Code. The Debtors shall give notice of any proposed modification to the United States Trustee and to any other parties designated by the Bankruptcy Court. The Debtors also reserve the right to make such modifications at any hearings on confirmation as are necessary to permit the Plan to be confirmed under section 1129(b) of the Bankruptcy Code.

**2.    Effectuating Documents and Further Transactions.** Each of the Debtors or the Liquidating Trustee, as applicable, is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

**3.    Corporate Action.** Prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the stockholders or directors of one (1) or more of the Debtors shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to section 1142(b) of the Bankruptcy Code and section 303 of the General Corporation Law of the State of Delaware without any requirement of further action by the stockholders or directors of the Debtors.

**4.    Bar Dates for Certain Claims.**

(a)    Administrative Claims Bar Date. All requests for payment of Administrative Claims (other than as set forth in Section 2.03 of the Plan) must be made by application Filed with the Bankruptcy Court and served on counsel for the Liquidating Trustee no later than thirty (30) days after the Effective Date. Unless otherwise provided herein, any Person that fails to File and serve a request for payment of an Administrative Claim on or before the Administrative Claims Bar Date shall be forever barred from asserting such Administrative Claim against the Debtors, their Estates or the Liquidating Trust and shall be enjoined and barred from commencing or continuing any action, employment of process or act to collect, offset or recover such asserted Administrative Claims. A request for an Administrative Claim that is made, or was made, on a proof of Claim and Filed with the Claims Agent is not sufficient and will be deemed Disallowed. The last day for the Liquidating Trust, or any other Person with standing, to File an Objection to any Administrative Claim shall be the later of (a) 180 days after the Effective Date, (b) 90 days after the Filing of such Administrative Claim or (c) such other date specified in the Plan or ordered by the Bankruptcy Court.

(b)    Final Fee Application Bar Date. All final requests for payment of Professional Compensation Claims pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code must be made by application Filed with the Bankruptcy Court and served on counsel to the Debtors, the Liquidating Trustee, the Liquidating Trustee's counsel, counsel to the Committee, and other necessary parties in interest by the Final Fee Application Bar Date, unless otherwise ordered by the Bankruptcy Court. Any Claimholder that fails to File and serve a request for payment of a Professional Compensation Claim on or before the Final Fee Application Bar Date shall be forever barred from asserting such Professional Compensation Claim against the Debtors or their Estates and shall be enjoined an barred from commencing or continuing any action, employment of process or act to collect, offset or recover such asserted Professional Compensation Claim. The Liquidating Trust, or any other Person with standing, shall have until the later of (a) forty-five (45) days from the Final Fee Application Bar Date to

object to any timely Filed and served Professional Compensation Claim or (b) such other date ordered by the Bankruptcy Court.

**5.      Payment of Statutory Fees.**  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  After confirmation, the Liquidating Trustee shall continue to pay US Trustee Fees pursuant to section 1930 of title 28 of the United States Code and to File quarterly reports with the Office of the United States Trustee until these Chapter 11 Cases are closed by the Bankruptcy Court, dismissed or converted.  This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that are retroactively applicable to confirmed chapter 11 cases.

**6.      Severability of Plan Provisions.**  Should the Bankruptcy Court determine, prior to the Confirmation Date, that any provision of the Plan is either illegal on its face or illegal as applied to any Claim or Interest, such provision shall be unenforceable as to all Holders of Claims or Interests or to the specific Holder of such Claim or Interest, as the case may be, as to which the provision is illegal.  Unless otherwise determined by the Bankruptcy Court, such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.  The Debtors reserve the right not to proceed with Confirmation or Consummation of the Plan if any such ruling occurs.

**7.      Successors and Assigns.**  The Plan shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns.  The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Entity.

**8.      Governing Law.**  EXCEPT TO THE EXTENT THAT THE BANKRUPTCY CODE OR BANKRUPTCY RULES OR OTHER FEDERAL LAWS ARE APPLICABLE, AND SUBJECT TO THE PROVISIONS OF ANY CONTRACT, INSTRUMENT, RELEASE, INDENTURE OR OTHER AGREEMENT, DOCUMENT OR SCHEDULE ENTERED INTO IN CONNECTION WITH THE PLAN, THE CONSTRUCTION, IMPLEMENTATION AND ENFORCEMENT OF THE PLAN AND ALL RIGHTS AND OBLIGATIONS ARISING UNDER THE PLAN SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO CONFLICTS-OF-LAW PRINCIPLES WHICH WOULD APPLY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF DELAWARE OR THE UNITED STATES OF AMERICA.

**9.      Incorporation of Documents.**  All schedules, exhibits or other related documents to the Plan are incorporated and are a part of the Plan as if set forth in full therein.

**10.      Filing of Additional Documents.**  On or before the Effective Date, the Debtors shall File such agreements and other documents, in form and substance acceptable to the Committee, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**11.      Dissolution of the Committee.**  On the Effective Date, the Committee shall be automatically dissolved and all members, Professionals and agents of such Committee shall be deemed released of their duties, responsibilities and obligations, and shall be without further duties, responsibilities and authority in connection with the Debtors, the Chapter 11 Cases, the Plan or its implementation.

## IX.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM. CLAIMHOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN. TAX CONSEQUENCES OF THE PLAN AS THEY RELATE TO THE LIQUIDATING TRUST CAN BE FOUND IN THE LIQUIDATING TRUST AGREEMENT.

## X.     FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

### A.     Feasibility of the Plan

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that such plan is feasible. A feasible plan is one that will not lead to a need for further reorganization or liquidation of the debtor, unless such reorganization or liquidation is contemplated by such plan. Since the Plan provides for the liquidation of the Debtors, the Bankruptcy Court will find that the Plan is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet their post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases. The Debtors believe that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code.

### B.     Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims and Interests vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class but, for that purpose, counts only those who actually vote to accept or reject the Plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their Ballots in favor of the Plan.

### C.     Best Interests Test

Even if a plan is accepted by each class of holders of claims, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of claims that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (i) all members of an impaired class of claims have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 case. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial advisors and restructuring consultants) that are allowed in the chapter 7 case, litigation costs and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also would prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

**D.      Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Plan**

The Debtors have prepared a liquidation analysis for the Debtors, attached hereto as Exhibit D. Based on such liquidation analysis, the Debtors estimate that the total amount available for distribution to Creditors would be significantly less than the total amount available for Distribution under the Plan. The Debtors believe that under the Plan, the amount available for Distribution to each Impaired Class of Claims or Interests would be at least as much as would be available to each Impaired Class of Claims or Interests under a liquidation pursuant to chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that the Plan is in the "**best interest**" of each Class of Impaired Claims or Interests.

**E.      Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative**

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if all impaired classes have not accepted it as long as at least one impaired class of Claims has accepted it. The Bankruptcy Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by Impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each Impaired Class that has not accepted it. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims whether the property subject to those liens is retained by the debtor or transferred to another Entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred Cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds

under clause (1) or (2) of this subparagraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

Because Interests are being extinguished under the Plan and, thus, the Holders of such Interests will receive no Distribution on account of such Interests, the votes of Class 6 Interests are not being solicited, and Class 6 Interests is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, the Debtors are seeking confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to such Classes and may seek confirmation pursuant thereto as to other Classes if such Classes vote to reject the Plan.

## XI.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the Debtors' alternatives include (a) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (b) the preparation and presentation of alternative chapter 11 plan or plans.

### A.  Alternative Plan(s) of Liquidation

If the Plan is not confirmed, the Debtors, the Committee or any other party in interest could attempt to formulate a different plan to either reorganize or liquidate the Debtors' Assets. The Debtors believe, however, that it is unlikely that such alternative plan could be formulated, confirmed and consummated prior to the Debtors' Chapter 11 Cases being converted into cases under Chapter 7 of the Bankruptcy Code. After examining the potential for alternative plans, the Debtors have determined that the Plan represents the best alternative to protect the interests of the Debtors' Creditors and other parties in interest.

### B.  Liquidation Under Chapter 7

If no plan is confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In a chapter 7 case, a trustee or trustees would be appointed to liquidate the Assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtors. However, the Debtors believe that the value received by a chapter 7 trustee for the Assets of the Debtors would be substantially less than the value received under the Plan. In addition, the Debtors believe that, in liquidation under chapter 7, before Creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such

trustees would cause a substantial diminution in the value of the Debtors' Estates. The Assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation.

The Debtors' liquidation analysis is premised upon a hypothetical liquidation in a chapter 7 case and is attached as Exhibit D to this Disclosure Statement. As shown in the liquidation analysis, the Debtors estimate that a liquidation under chapter 7 of the Bankruptcy Code will produce significantly less value than the Plan. In fact, the liquidation analysis indicates that under a chapter 7 liquidation, no distribution will be made to Unsecured Creditors. Therefore, the Debtors believe the Plan provides a greater potential for realization than a liquidation under chapter 7 of the Bankruptcy Code.

## XII.    THE SOLICITATION AND VOTING PROCEDURE

### A.    General

On [_____,] 2011 the Bankruptcy Court approved an order (the "**Disclosure Statement Order**"), approving this Disclosure Statement, setting voting procedures, and scheduling the hearing on confirmation of the Plan, among other things. A copy of the notice of Confirmation Hearing (the "**Confirmation Hearing Notice**") is enclosed with this Disclosure Statement. The Confirmation Hearing Notice sets forth in detail, among other things, the voting deadlines and Objection deadlines with respect to the Plan. The Confirmation Hearing Notice and the instructions attached to the Ballot should be read in connection with this Disclosure Statement.

### B.    Parties Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "**impaired**" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (1) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (2) the claim or interest is impaired by the Plan. If the holder of an impaired claim or impaired interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan. If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan, and the plan proponent need not solicit such holder's vote.

Except for Holders of Class 6 Interests, who are presumed to have rejected the Plan, the Holder of a Claim that is "Impaired" under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a Distribution in respect of such Claim and (2) (a) the Claim has been scheduled by the respective Debtor (and such Claim is not scheduled as disputed, contingent or unliquidated), (b) such Claimholder has timely Filed a Proof of Claim as to which no Objection has been Filed, or (c) such Claimholder has been granted authority by the Bankruptcy Court under Rule 3018 of the Federal Rules of Bankruptcy Procedure to temporarily allow such Claim for voting purposes only.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions

of the Bankruptcy Code. The Disclosure Statement Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

## C. Classes Impaired under the Plan

The following Classes are Impaired under the Plan and entitled to vote to accept or reject the Plan:

- Class 4 Allowed Other Secured Claims; and
- Class 5 Allowed General Unsecured Claims

Class 1 Prepetition Secured Lender Claim, Class 2 Postpetition Secured Lender Claim, and Class 3 Allowed Tax and Other Priority Claims are Unimpaired and deemed to accept the Plan. Class 6 Interests are receiving no Distribution under the Plan and are, therefore, not entitle to vote and deemed to reject the Plan.

## D. Waivers of Defects, Irregularities, Etc.
Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtors as set forth in the Disclosure Statement Order, which determination will be final and binding.

## XIII.   RECOMMENDATION AND CONCLUSION

THE PLAN PROVIDES FOR AN EQUITABLE DISTRIBUTION TO ALL CREDITORS OF THE DEBTORS.  THE DEBTORS BELIEVE THAT THE DEBTORS' CREDITORS WILL RECEIVE GREATER AND EARLIER RECOVERIES UNDER THE PLAN THAN THE RECOVERIES THAT WOULD BE ACHIEVED THROUGH A LIQUIDATION PURSUANT TO CHAPTER 7 OF THE BANKRUPTCY CODE OR ANY ALTERNATIVE PLAN THAT MAY BE PROPOSED.  FOR THESE REASONS, THE DEBTORS STRONGLY URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.

~~/s/ Scott D. Cousins~~
~~Scott D. Cousins (Del. Bar No. 3079)~~
~~Sandra G. M. Selzer (Del. Bar No. 4283)~~
~~GREENBERG TRAURIG, LLP~~
~~The Nemours Building~~
~~1007 North Orange Street, Suite 1200~~
~~Wilmington, Delaware  19801~~
~~Telephone:  (302) 661-7000~~
~~Facsimile:  (302) 661-7360~~
~~cousinss@gtlaw.com~~
~~selzers@gtlaw.com~~
~~-and-~~
~~Nancy A. Mitchell~~
~~GREENBERG TRAURIG, LLP~~
~~200 Park Avenue~~
~~New York, New York  10166~~
~~Telephone:  (212) 801-9200~~
~~Facsimile:  (212) 801-6400~~
~~mitchelln@gtlaw.com~~

~~Counsel for the Debtors and~~
~~Debtors in Possession~~

/s/ Scott D. Cousins
Scott D. Cousins (Del. Bar No. 3079)
Sandra G. M. Selzer (Del. Bar No. 4283)
GREENBERG TRAURIG, LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware  19801
Telephone:  (302) 661-7000
Facsimile:  (302) 661-7360
cousinss@gtlaw.com
selzers@gtlaw.com

-and-

Nancy A. Mitchell
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York  10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400
mitchelln@gtlaw.com

*Counsel for the Debtors and
Debtors in Possession*

Document comparison by Workshare Professional on Tuesday, August 23, 2011
3:24:43 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://DEL-DMS1/DEL/86351495/9 |
| Description | #86351495v9<DEL> - Ultimate Escapes Disclosure Statement |
| Document 2 ID | interwovenSite://DEL-DMS1/DEL/86351495/14 |
| Description | #86351495v14<DEL> - Ultimate Escapes Disclosure Statement |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 210 |
| Deletions | 284 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 494 |